RICE DANIELS ET AL. v. H. A. FITZHUGH.

No. 1510.

**1.  Change of Venue—Controverting or Qualifying Affidavits.**

Under Revised Statutes, 1879, art. 1271, prior to the amendment of 1893 permitting affidavits for a change of venue to be controverted, it was error to grant change of venue on affidavits complying with the statute, where affiants by subsequent affidavits had so far qualified their original affidavits as to leave no ground for a change of venue.

**2. Same.**

The court should have considered such qualifying affidavits with those of other parties showing how the original affidavits were procured, in determining whether there was a compliance with the statute.

**3. Boundary—Evidence—Affidavit of Deceased Surveyor.**

A certified copy, from the general land office, of an affidavit of a deceased surveyor, there on file, as to the connection of lines of certain surveys made by him, upon the ground, was not properly authenticated, not being an archive of the land office, and was not admissible in evidence as a declaration of such deceased surveyor.

**4. Same—Declaration of Deceased Surveyor.**

Upon a question of boundary a deed to and shown to be in the handwriting of a deceased surveyor, who had located one of the surveys in controversy, was properly admitted as a declaration by such deceased as to the location of a corner, the bearing trees of which were therein described.

**5. Same.**

Patent and field notes of another survey made by such deceased surveyor, and tending to show that a line called for in the survey in controversy, and also in the one offered in evidence, was a marked boundary, recognized by him, was properly admitted as a declaration by such surveyor.

APPEAL from District Court, Fannin County. Tried below before Hon. E. D. McCLELLAN.

*E. C. McLean, J. P. Leslie, Silas Hare, Jr.*, for appellants.—When the compurgators supporting an affidavit for a change of venue do, each and all, in another affidavit, swear that the affidavit made by them on which the motion changing the venue is based was not read to them correctly, and that the notary public before whom the affidavits were made was the person who read and explained the affidavits, and also testify that they did not know of any combination against the defendant, as stated in their affidavit on which motion is based, then there is not a compliance with the statute, and the motion is not supported by the affidavits of three credible persons.   Rev. Stats., art. 1271.

The court erred in not sustaining the motion of plaintiff to re-transfer this case back to Grayson County, from Fannin County, where it had been transferred on motion for change of venue.

The court erred in not permitting the plaintiff to read in evidence the affidavit of J. P. Dumas in connection with Y. S. McKinney of date May 24, 1871.   Brown v. Bedinger, 72 Texas, 249; Ayers v. Harris, 77 Texas, 115; Tucker v. Smith, 68 Texas, 478; Hurt v. Evans, 48 Texas, 311.

The court erred in admitting the deed from G. B. Pilant to J. P. Dumas of date August 24, 1849, the admitting of said deed being for the purpose and sole purpose of showing that J. P. Dumas had written said deed and had in the field notes describing the land conveyed in said deed called for bearing trees that the witness Sam Bonham had testified were east of the true G. B. Pilant line, and thus by the said field notes to prove that said J. P. Dumas had not reached the true east line of Pilant's survey, when he originally surveyed the Winford Bailey, for the reason that any statement of said Dumas, as contained in said deed,

would be a declaration of a grantor derogatory of his title after he had conveyed title, and on the further ground that none of the plaintiffs, save and except Will Leslie and wife, Bell Leslie, held under or were privies to said J. P. Dumas.    1 Greenl. Ev., 189, 204; Thompson v. Herring, 27 Texas, 282.

The court erred in not permitting the plaintiff to read in evidence the patent or original field notes of the H. C. Atchison survey made by J. P. Dumas January 23rd, 1852, in which field notes the said J. P. Dumas used the following language: "Thence south 13 west with said Burleson's west line 228 vrs. to Calf Creek; again at 1208 vrs. unexpectedly intercepting G. B. Pilant's east line"—as said language shows or tends to show that the said Pilant's east line was marked or could in some way be identified on the ground and (it having been previously shown that said Dumas was the surveyor who had located the Winford Bailey, the west line of which is in dispute in this cause) whether or not, in fact, the said Winford Bailey had been connected on the ground with the said Pilant's east line.    Linney v. Wood, 66 Texas, 30.

*W. W. Wilkins*, for appellee.—The motion to strike out the counter affidavits was properly sustained.    If the application for a change of venue was in due form and supplemented with the number and kind of affidavits prescribed by the statute, which was not denied, but was admitted to have been done, the only inquiry, permitted by the statute was as to the credibility of the persons making the supporting affidavits; the credibility of such persons in this case was not attacked.    1 Sayles' Civ. Stats., art. 1271; Salinas v. Stillman, 25 Texas, 12; Farley v. Deslonde, 58 Texas, 588.

At the time the affidavit was made Dumas was an interested party, he being the owner of the east half of the Pilant survey, the east line of which is involved in this controversy.    The declarations of a deceased person in reference to a boundary line are not admissible unless such person was at the time of making the declaration a disinterested person. Stroud v. Springfield, 28 Texas, 649; Hurt v. Evans, 49 Texas, 311; Tucker v. Smith, 68 Texas, 473.

There was no proof of the genuineness of the affidavit; the original was not produced, but only a copy from the general land office; it was not an archive, hence a certified copy was not admissible; it was not shown how the paper got into the land office, nor was it shown for what purpose, or under what circumstances it was made; it was made long after the survey of the several tracts of land, about the boundaries of which there was a dispute; it was ex parte and was wholly unattended with any of the facts and circumstances under which that character of testimony could be introduced.

The deed from Pilant to Dumas was admissible to show that Dumas, when he located the Bailey survey, was mistaken as to the true location of the east line of the Pilant, Thompson and Kitchen surveys; and that when he called for the east line of the Pilant survey, and established the

N. W. corner of the Bailey as being in the Pilant, he had not reached the Pilant, but in fact the N. W. corner of the Bailey, as established by him, was 109½ varas east of the Pilant. On the right to introduce the declarations of Dumas: Finney v. Wood, 66 Texas, 22; Springfield v. Stroud, 28 Texas, 666; Ayers v. Harris, 77 Texas, 115. On the question of mistake by Dumas as to the true east line of the Pilant: Evans v. Foster, 79 Texas, 48; Oliver v. Mahoney, 61 Texas, 610.

Ordinarily a case tried before the judge, without a jury, will not be reversed on account of the admission of illegal testimony, and not at all, unless it should appear that such testimony influenced the judge in deciding the case. Gray v. Shelby, 83 Texas, 405; Railway v. Turner, 1 Texas Civ. App., 625; Hill v. Smith, 25 S. W. Rep., 1079.

The field notes of the Atcheson were immaterial, and would have shed no light on the question at issue, this is as to whether the Bailey and Pulliam were actually joined to the Pilant, Thompson and Kitchen on the east.

COLLARD, ASSOCIATE JUSTICE.—This suit was brought in Grayson County, November 2, 1890, by appellants Rice Daniels, Peter Campbell, Mrs. Belle Leslie, joined by her husband Will Leslie, Mrs. E. C. McLean, joined by her husband E. C. McLean, all of whom reside in Grayson County, against appellee Henry A. Fitzhugh, who resides in Travis County, Texas, to cancel patent to appellee for the land in controversy, dated Nov. 4th, 1890, on the grounds that the land had been previously patented and that appellants were the owners and in possesion of the land and had been so for a long time prior to the issuance of the patent to appellee. It was admitted on the trial that plaintiffs below were the owners of the land in controversy, described in the petition, provided it is included in either or all the surveys,—the G. B. Pilant, Robt. Thompson, John Kitchen, Winford Bailey and W. H. Pulliam,—and that the question to be tried is whether or not, at the time of the patent in suit to defendant, there was any vacant land between the Pulliam, on the East, and the Pilant, Thompson and Kitchen surveys on the West, and whether said vacant land was included in defendant's patent, which called to cover a vacant strip 125 varas wide and 4656 varas in length. The issue was whether there was any such vacancy subject to location at the time of defendant's patent.

March 13, 1891, defendant Fitzhugh filed a motion to change the venue from Grayson County upon the ground that "there is a combination against him in Grayson County, instigated by influential persons, by reason of which he cannot expect a fair and impartial trial of the cause." The motion was supported by his own and the affidavits of four other persons,—J. H. Webster, T. E. Newton, James D. Haley, and L. E. Powell. Plaintiffs answered the motion, charging that the affidavits of Haley, Webster and T. E. Newton were obtained by fraudulently and untruthfully representing the contents of the affidavits, and that they were made under misapprehension of the contents, and that

they would not have been made had the affiants known the contents of the same, wherefore the affidavits, as they appear on their face, were not in fact made as they appear. The affidavits of Haley, Webster and Newton are attached to the answer to the motion.

Haley's affidavit shows that his first affidavit was made before one Haizlip, a notary public, and that he made the affidavit under the following circumstances: "That Haizlip had the affidavit already written out and that he only read to the affiant the portion of the affidavit 'by reason of which he cannot expect a fair and impartial trial.' Said Haizlip with a small pencil drew a line from where Electric Belt line was, and from the way he explained I was under the impression that it was an old suit I had heard about several years ago, about a line from Grays Hill, in West of Sherman, through the town; and my idea was that if it was that old suit, and the plaintiffs all residing here and the defendant a stranger, that the way he read the affidavit it was all right. Affiant says that the said affidavits as to a combination against defendant, Henry A. Fitzhugh, instigated by influential persons or a combination of any kind, is not true as far as affiant knows, and that had said portion of said affidavit been read to him he would not have made said affidavit."

Webster's affidavit shows that his affidavit was made before the same notary public, "that said affidavit (his own attached to the motion to change the venue) was read to him by said Haizlip, and that he, affiant, did not read said affidavit. That affiant cannot say Haizlip did not read all of said affidavit to him, but does say that the only portion of said affidavit that affiant caught and understood the meaning of was that it was not probable that defendant could expect to get a fair trial. That said Haizlip explained to affiant that the plaintiffs were influential persons and named them. I only remember the name of E. C. Barksdale, who I knew to be agent of the Houston and Texas Central Railway, and I understood him to say another was president of a bank or in some way connected with a bank. In all he named five, I think, and that the defendant was a resident of Houston; and Mr. Haizlip explained to me that because defendants (plaintiffs?) were residents of Sherman, and well known, and plaintiff (defendant?) was a resident of Houston, that it was not as probable that he could get a fair trial in Sherman as away from there, and he wanted to change it to Bonham, where all would have some show; and all I know about the matter was what Mr. Haizlip told me. The affiant has no acquaintance with and never heard of Mr. Fitzhugh, the plaintiff (defendant?), until that morning when Mr. Fitzhugh came in the office and Mr. Haizlip introduced me. Affiant says the only one of the plaintiffs that he knows is E. C. Barksdale. Affiant says he does not know of any combination of influential persons, or a combination of any kind, against defendant Henry A. Fitzhugh,—nothing more than that plaintiffs are residents of the neighborhood of Sherman and defendant resident of Houston; and that had he fully understood the full meaning of the affidavit he would not

have made the same. Affiant says that from the explanation given him by Mr. Haizlip he signed the affidavit with the idea that if Mr. Fitzhugh could not get a fair trial in Grayson he wanted him to get justice, and for both sides to have justice where they thought they could get justice —and they said Bonham."

The affidavit of T. E. Newton, filed with the answer of plaintiffs to the motion to change the venue, shows "that affiant is not acquainted with either the plaintiffs or defendant Henry A. Fitzhugh. That one J. D. Haizlip, the attorney, of Sherman, just as affiant was leaving the city, the said Haizlip called to this affiant and said to him that he thought that affiant could help him in a law suit then pending in the district court of Grayson County, and asked this affiant to come up to his office, which affiant did; and when affiant went up to said Haizlip's office he, Haizlip, asked affiant if he didn't believe that a man that was acquainted in the community didn't stand a better show to get a verdict than a stranger, and affiant told Haizlip that it looked a little reasonable; then Haizlip told affiant that it would help him, Haizlip, in the above entitled cause, if affiant would make affidavit for him; that he wanted to change the venue in the above cause; and told affiant that L. E. Powell and others had made and signed an affidavit to change the venue. That said Haizlip had said affidavits all ready written up and prepared and ready to sign; that said Haizlip read the last part of the affidavit, to-wit: that the defendant cannot expect a fair and impartial trial, and then asked this affiant to sign and swear to said affidavit, and, at the request of said Haizlip, affiant did sign and swear to said affidavit without reading the same; and affiant further says that he relied upon said Haizlip's statements as to what the affidavit contained, and that, if affiant hadn't been misled as to the truth of the contents of said affidavit, that the affiant would never have signed the same; and that affiant would not swear today that there is a combination against the defendant Henry A. Fitzhugh by these plaintiffs, as he, affiant, is not acquainted with the parties to this suit. Affiant says he didn't intend to swear that, and will not now swear that there is a combination against defendant Henry A. Fitzhugh, instigated by influential persons; that this affiant does not know of any such combination, nor does he, affiant, believe there is any such combination against defendant Fitzhugh; and affiant further says that he does not know of any reason why defendant can't get a fair and impartial trial in Grayson County, Texas."

On hearing the motion and the foregoing affidavits the court granted defendant until the next Monday to procure additional affidavits. This was on March 16, 1891. On Monday, May 11, 1891, the defendant procured the affidavits of Sam Bonham and J. M. Estes, complying with the statute, swearing that there was a combination against defendant, instigated by influential persons, by reason of which he could not expect a fair and impartial trial of the cause. The record next shows the action of the court upon the motion to change the venue, sustaining the motion and ordering that the venue of the case be changed to Fannin

County District Court, to which plaintiffs reserved exceptions. Following this order, the record shows bill of exceptions by plaintiff, which was allowed and approved by the court. The bill recites the fact that defendant filed his own and the affidavits of J. H. Webster, T. E. Newton, H. D. Haley and L. E. Powell, to change the venue, stating the cause alleged; that plaintiffs resisted the motion, stating the grounds and referring to the retracting affidavits of Webster, Newton and Haley, setting out the affidavits in full as above. The bill of exception also shows that L. E. Powell, who had made affidavit as one of the compurgators, was placed on the stand and testified that the notary, Jas. D. Haizlip, before whom the affidavit was made, had explained to him that the combination he swore to was not an unlawful combination, and that witness looked at the names of plaintiffs and knew that they were influential persons, and that the combination he testified to was the plaintiffs, who were influential persons, were combined together to beat the defendant, and that it was not an unlawful combination he had reference to in his affidavit, if he was swearing that there was an unlawful combination.

The bill also shows that defendant then read affidavit of Jas. D. Haizlip, the notary before whom the original affidavits were made, which shows that the affidavits were fully explained to the affiants by him, that every part of the affidavits were read and explained by him to them; that "the combination instigated by influential persons was specially explained, and that there was no concealment of any facts pertinent to the affidavits, and no advantage whatever was taken of the affiants; but that the affidavits were obtained fairly, and they understood or appeared to understand the contents of the same; that in reference to the combination, it was understood and discussed between affiants and him, and the combination was not claimed to be an unlawful combination, but was such a combination of influential persons as that defendant could not expect to get a fair and impartial trial."

Defendant then introduced affidavit of H. M. Spencer, as the bill of exceptions shows, in which he says: "I stay in and make my headquarters at J. D. Haizlip's office." Mr. Haizlip asked him if he could make the affidavits, and Haizlip fully informed him of what was wanted, and read the affidavit to him fully, concealed nothing; but that affiant could not swear to it, as he was related to one of the plaintiffs. That on that morning, March 13, 1891, he was in the office of Haizlip when L. E. Powell made the affidavit; that Haizlip read over the affidavit fully and correctly and asked Powell to sign it. Powell said to Haizlip: "How do I know about there being a combination against defendant?" and Haizlip said: "I do not mean to say that there is any unlawful or illegal combination against defendant, but I do mean that they are all combined in the suits against him" and that he, Haizlip, would get the papers in the suit and show him the names of the parties plaintiff in said suits, and that they were all influential persons, and that was the combination he meant, and then said: "If you cannot conscientiously make

the affidavits I would not have you do it." Powell looked at the papers and remarked that they were all good men, but on account of their popularity and influence they had the advantage of defendant, and he signed the affidavits and swore to them. I also heard Haizlip read the law on the change of venue to some one, but I do not know who. Haizlip's whole conduct in regard to this matter was perfectly open and fair in every respect.

The bill of exceptions then shows that defendant then introduced the affidavit of Wiley Small, which declares that he knew about the conduct of J. D. Haizlip in getting up affidavits for change of venue in the case. Affiant says: "I stay in Haizlip's office and make my headquarters there, and about March 12, 1891, I heard Haizlip say that he was going to get up some affidavits for change of venue; and about this time H. M. Spencer came into the office and then Haizlip read the affidavits and the law bearing on the subject of change of venue to me and said Spencer, explaining it fully to us, and said that he did not say or charge the plaintiffs with unlawfully combining together to defeat Fitzhugh, but that he did claim that they were all influential persons, and that they were all combined together in suits, and would use all legitimate means to defeat him in the suits, and for that reason he wanted a change of venue. I heard Haizlip have a conversation with two other parties about this matter, and he explained and read over the affidavits fully to them, just as he had to me and Spencer; and he also read the law to one of them certain, and I think he read the law to both of them; and he also handed the affidavits to one of them to read. I am not certain whether he handed the affidavits to the other to read or not. Both of these parties were strangers to me and I do not know their names. About March 13th, Haizlip and a man I did not know came into the office, and I was sitting at my desk, and Haizlip and this man sat down at Haizlip's desk, and Haizlip took the affidavits in his his hand and read them over to him, in about the same manner as he had to me and the others, and when this man went out of the office I asked Haizlip who he was, and Haizlip told me that his name was Newton. I know that Haizlip explained and read over these affidavits to this man, as he did to all the others that I heard him talk with. Everything I saw Haizlip do or say in getting up these affidavits was perfectly fair, open and honorable in every particular."

The bill of exceptions also shows that the defendant read the affidavits of Jas. D. Haley, who says, "that the affidavit made by me in the cases of C. C. Fitch and others, and Rice Daniels and others against Henry A. Fitzhugh were made by me in the office of J. D. Haizlip, on the day they bore date, and the facts connected with the making of said affidavits are as follows: Mr. Haizlip asked me if I could make the affidavits and handed them to me, they being already written out. He and I sat down by a table, and Mr. Haizlip undertook to explain to me the nature of the suits and the facts connected with them, and named the parties to the suits, and asked me if I thought the defendant could get a fair

and impartial trial in the county. I answered that they could not. He then read the affidavits over to me and handed or shoved them to me, and I undertook to read them myself, but the writing was not very plain to me and I could not read all of their contents. I then handed the affidavits back to Mr. Haizlip, and he read them over to me again and asked me if I could make the affidavits. I answered that I could. He asked me if I understood it, and I told him that I did, but it seems that I misunderstood where the land lay, for I thought it was through Sherman. I then signed the affidavits and swore to them before Mr. Haizlip. I then left his office and as I went out of the office I turned and asked him if the papers I had signed would give me any trouble about attending court. He answered, no, not as much as a witness. On the following Sunday several gentlemen asked me if I had seen Will Leslie and told me that he was looking for me. On the next morning Will Leslie came to my house before breakfast and told me he wanted to see me about the application for a change of venue in the land suit, said it just took a strip off his land. He asked me to go up town with him. I told him that I had not had my breakfast. He asked me how soon I could go to town. Asked me if I could get there by 8 o'clock. I told him I could. We arranged to meet at Schneider's corner. In the conversation at my house Leslie said to me, Jas. Haizlip was liable to get into trouble by such work as that, by getting the affidavits. He wanted me to go with him to McLean's office, and said it would save trouble for both of us. He said a great deal to me at the house that I cannot recollect, but what he did say frightened me, for I thought that I had gotten myself into trouble, and I promised him to come to town, and did come and meet him, and went with him to McLean's office. McLean came in and Leslie said to him: 'Ah, you rascal, how came you so late?' Then McLean took the affidavits made by Webster and Newton out of his pocket and read them over to me,—I mean the long affidavits of Webster and Newton stating how they came to sign the affidavits made before Mr. Haizlip and the means by which he had obtained them. And then he read the affidavits that I made before Mr. Haizlip. Leslie told McLean that I was mistaken in the land sued for. Leslie had said to me, before that, that Lon McCowan told him that he was satisfied that I was mistaken about the land; and I told Leslie that if I was I would make it all right. As soon as Leslie told McLean that I was mistaken about the land McLean went to writing, and wrote up a paper and read it over to me. I did not read it. I can't remember what the paper contained. I was scared and uneasy, for I thought that I had gotten into a scrape, for Leslie had told me that I was liable to get into trouble, and having taken me up to a law office did make me uneasy. I did not know what was to pay. I did not know anything about law, and I signed the paper McLean wrote, thinking that it would straighten the thing up and let me out. I thought that I had better go with Newton and Webster. McLean told me that Daniels was mad, and cursing and swearing and rearing about it."

The bill of exceptions also shows that defendant introduced and read affidavit of J. H. Webster, who says: "The affidavit for change of venue in cause of C. C. Fitch et al. and Rice Daniels et al. v. Henry A. Fitzhugh was given to Haizlip as follows: I was standing down on sidewalk, in front of stairway of said Haizlip's office, when Mr. Haizlip came up and spoke to me, and we were talking and spoke of the suits in question. I told him that I knew nothing about it, and then he told me about it. I also told him I knew none of the parties. He spoke of only E. C. Barksdale, Houston and Texas Central agent. Mr. Haizlip explained the matter in this way: All the parties on one side live in, or in the neighborhood of, Sherman, and the other party, Austin; but I think I told McLean I thought it was Houston where he lived. Mr. Haizlip told me, as one side lived at Sherman and the other at Austin, all probabilities were he could not get as fair a trial in Sherman as some other place. They were all strangers and he wanted to move it to Bonham, as all would be there, and wanted a fair trial. I told him that I knew nothing about the matter, but I would like to see both sides have justice, and from that understanding I made the affidavits. We then went up into Mr. Haizlip's office and he showed me the affidavits and read them over, and I then swore to them. I could not say he did or did not read all of the affidavit to me, but from the way I understood the matter, was, that if either side could not get a fair trial in Sherman, to move it somewhere where they could have justice. I could not say Haizlip misrepresented anything in the affidavits to me, and could not say he did obtain the same from me by fraud, for I understood all they wanted was a fair trial; and I don't think there was any fraud on the part of Haizlip, nor I did not tell McLean that."

The bill of exceptions also shows that plaintiff introduced the affidavit of J. M. Estes, who, the affidavit states, made an affidavit in the cases of Rice Daniels et al. v. Henry A. Fitzhugh and C. C. Fitch et al. v. Henry A. Fitzhugh, sworn to before C. J. Hinkle, Justice of the Peace, in Sherman, to change the venue; and affiant says: "That I made the affidavit under the following circumstances: Mr. Wiley Small, J. D. Haizlip and Sam Bonham informed affiant that there was a combination against the defendant—against Henry A. Fitzhugh, and asked me if I thought he could get a fair trial in Grayson County. I told him if there was such a combination I did not think he could. The affidavit was read to me, but I understood that I was only swearing that if there was a combination against defendant, instigated by influential persons, .that then, in that case, the defendant could not expect a fair and impartial trial. I now swear that, if I had been informed and understood that I was swearing that there was a combination against defendant, instigated by influential persons, that I would not have made such affidavit, as I know nothing of said combination except what Haizlip, Small and Bonham told me. I was not even informed as to who the parties were to the suit, and not until shown this morning did I know that Rice Daniels and E. C. McLean were plaintiffs in the suits.

I also swear that before I signed said affidavit I asked who the other lawyers were; and I think they said Bliss, and I had better see what he said first, as there was always two sides to a case; and Mr. Haizlip said there was no use to go and see the other lawyer, as he would not deny there was a combination. I did not read the affidavit myself, and only took the word of Haizlip and Small as to what it was; they both read. it to me, and I understood that I was swearing that, in case there was such a combination, that defendant could not get a fair trial. I know nothing of such combination, and know of no reason why defendant cannot get a fair and impartial trial in Grayson County. I have read the above affidavit myself and sign the same after so reading."

After the last and foregoing affidavit of Estes had been read, defendant moved the court to strike it out as being irrelevant, unauthorized by law, and raising issues which could not be tried on the motion to change the venue; and after hearing the motion to change the venue the court sustained the motion, holding that not only said counter-affidavit, but all others introduced by plaintiff were, in fact, unauthorized by law, "because the same were in effect inquiries into the reason of information and sources of information of the several affiants." Whereupon the court granted the change of venue as prayed for, without in any manner passing upon the counter-affidavits, but expressly ignored the same as being unauthorized by law. To all of which plaintiffs excepted and tendered bills of exceptions, which were allowed by the court and made a part of the record May 25, 1891.

After the same was changed to Fannin County, plaintiffs, on the 4th day of September, 1893, moved the court to transfer the case back to Grayson County, upon the ground that when the venue was changed plaintiffs could not controvert the affidavits filed in favor of the change of venue, but that the law, as amended, permitted such controverting affidavits; and they asked that the cause be sent back to Grayson County, where it properly belongs, that the truth of the affidavits might be investigated,—the record showing that the affidavits for change of venue were contested and bill of exceptions taken to the change of venue. This motion to transfer the case back to Grayson County was overruled,—plaintiffs excepting. The cause was tried in Fannin County, and resulted in verdict and judgment for part of the land described in this patent. Plaintiffs have appealed.

*Opinion.*—The first error assigned is, that the court erred in sustaining the defendants' motion to change the venue, because the affidavits in support of the motion to change the venue were controverted by counter-affidavits of the same persons, to the effect that the affidavits which they signed, and on which the motion was granted, were not read to them correctly, and that, had they known the true meaning of the same, they would not have sworn to the same; and further, that said counter-affidavits were to the effect that they did not know any facts, grounds, or legal reasons for changing the venue; and further,

that the affidavits supporting the motion to change the venue were obtained by fraudulent and false representations as to the true contents of the same.

This assignment of error should be sustained. At the time the venue was changed the statute provided that, "A change of venue may be granted in any civil cause upon the application of either party, supported by his own affidavit and the affidavit of at least three credible persons, residents of the county in which the suit is pending, for any of the following causes:" The first cause is not applicable to this case; the second cause is, "2. That there is a combination against him instigated by influential persons, by reason of which he cannot expect a fair and impartial trial." Rev. Stats., 1879, art. 1271.

Article 1272 provides that, "Where application for a change of venue is made in conformity to the requirements of the preceding article the same shall be granted, unless it appear to the satisfaction of the court, upon proof made before him, that the persons making the affidavit are not credible persons." Under the foregoing statutes no issue could be inquired into except the credibility of the affiants. Their means of knowledge of the facts stated could not be shown (Farley v. Deslonde, 58 Texas, 588), nor could counter-affidavits controverting the truth of the fact alleged as a cause for changing the same. The statute was in 1893 amended, allowing inquiry into the means of knowledge of the compurgators, as well as the truth of the facts set out in the application. The amended statute, however, could not be applied to application of defendant, because it was made and acted on before the law was amended.

The statute did, at the time of defendant's application, require that it be supported by at least three credible persons. It was supported by four persons when filed, and others afterwards, but before it was acted on by the court the affiants, or at least a number of them, reducing them to less than three, qualified the averments of their original affidavits so that the grounds for the removal of the case did not exist when the court came to act upon the application. The court below construed the counter-affidavits of the original compurgators to be an inquiry into their means of knowledge of the facts sworn to, and there were some statements in the counter-affidavits to that effect,—going to show that they had sworn to facts which they did not have any knowledge of. But the counter-affidavits showed more than a mere want of means of knowledge; they showed want of knowledge and a denial of the facts relied on to change the venue. We think these affiants making the original affidavits had the right to withdraw them or to qualify them so as to make them speak the truth. The rule is not so inflexible, prohibiting counter-affidavits on motions to change the venue under the old statute, that the affidavit cannot be withdrawn or altered by the affiant himself, if it were false. The court would not hold a man bound unalterably to a false affidavit, if withdrawn by him before acted upon. The law prefers the truth, and would encourage the qualifying of a fact

sworn to, so as to make it true. The affiants supporting the application, by subsequent affidavits, tended to destroy their first affidavits, or at least so qualified them as to leave no ground for change of venue. The court should have considered all the affidavits for what they stated and determined whether they were affidavits of three credible persons, supporting the motion, taking into consideration the counter-affidavits and sworn statements of the compurgators as to the truth of the statements first made to change the venue.

In failing to do this the court erred, and for this error the cause must be transferred back to Grayson County by the Fannin County District Court.

2. Plaintiff offered in evidence a certified copy from the general land office of an affidavit of J. P. Dumas and Y. S. McKinney, made the 24th day of May, 1871, it having been proved that Dumas was the surveyor who located the Winford Bailey survey, the west line of which is in dispute, it being also shown that Dumas was dead, McKinney being alive and having testified by depositions on the trial. The copy shows that the affidavit was made by Dumas and McKinney, May 24, 1871, before the Clerk of the District Court of Grayson County. It shows first, that Dumas affirms that he did, as county surveyor of Grayson County, make the Winford Bailey survey for 333333/1000000 labors of land, and that, in making said survey, he, as county surveyor, connected said Bailey survey on the west side with a part of the old lines of the G. B. Pilant 1280 acre survey, and one Robert Thompson, deceased, 320 acre survey, and also the John Kitchen's 640 acre survey; at the time of making the Bailey survey, the aforesaid lines of the Kitchen, Thompson and Pilant surveys were plainly marked and well established, and by him correctly retraced. Second. Y. S. McKinney's part of the affidavit shows that he, as county surveyor of Grayson County, on or about the 4th of November, 1853, made the Wm. H. Pulliam survey, situated and adjoining the Bailey on the north, and joins the east line of the G. B. Pilant survey, and did connect Pulliam on the ground with the Pilant's line and to the lines and corners of the Bailey, as represented in the field notes of the Bailey and Pulliam surveys. Both affiants agree and state that, notwithstanding the discrepancy on the county maps and the files which have recently been made by those who suppose that there is vacant land between said surveys, there is no vacancy on the ground. The court, upon objections of defendant, excluded the affidavit, and we think the ruling was correct. The affidavit was not an archive in the land office; it seems to be the voluntary affidavit of the parties. It does not prove itself, and the certificates of the Commissioner of the Land Office to the copy could not authenticate it and make it admissible in evidence as declarations of deceased Dumas. It is not contended that it should have been admitted as declarations of McKinney, who is living, and who testified on the trial. The Pilant survey was made in 1849; Robt. Thompson in 1847; the Bailey in 1854; the Pulliam in 1855, and the Kitchen in 1857, and all were patented

long before the affidavit was made, and it is not shown that the same had any official connection with these original surveys, nor that the affiants were acting officially. It was not an archive in the general land office.

3. There was no error in admitting the deed of G. P. Pilant to J. P. Dumas of August 24, 1849. It was shown that it was in the handwriting of Dumas and was admissible, certainly as against Will Leslie and wife, against whom alone it was admitted. Linney v. Wood, 66 Texas, 22; Ayers v. Harris, 77 Texas, 115; Hunt v. Evans, 49 Texas, 311.

4. The court erred in excluding the patent with original field notes of the H. C. Atchison survey made by J. P. Dumas, January 23, 1852. The field notes call for the Pilant, and tend to aid in locating it, and to show that the Pilant east line was a marked boundary so that the surveyor recognized it on coming upon it in surveying the Atchison, and this would have some force in leading to the conclusion that when the same surveyor in 1854 was making the Bailey survey, surveying the north line, he was not mistaken in calling for Pilants east line. The plaintiffs were entitled to the testimony for what it was worth. It is true that in the same call for the E. line of the Pilant he witnessed the call and corner by an Elm N. 78, East 80 varas, marked B., the same bearing tree that fixes the southeast corner of the Pulliam and called for, which corner the testimony tends to show is $109\frac{1}{2}$ varas east of the marked line of the Pilant, thus showing a vacancy as claimed by defendant, and covered by his patent. It is not our intention to express an opinion as to the question of vacancy, but we do intend to say that plaintiffs were entitled to the legitimate testimony tending to establish his position that there was in fact no vacancy.

It would not be proper for us to pass upon other assignments as they refer to the facts and the conclusions that ought to be derived from them. These questions we leave without prejudice to be determined by another trial. The judgment of the lower court is reversed, and it is ordered that the lower court transfer the cause back to the District Court of Grayson County as hereinbefore required.

*Reversed and remanded.*

Decided April 8, 1896.