### STATE v. FLICK et al.
### No. 4251.

Court of Civil Appeals of Texas. El Paso.

Oct. 28, 1943.

Rehearing Denied Dec. 2, 1943.

Gerald C. Mann, Atty. Gen., Glenn R. Lewis, Will R. Wilson, Cecil C. Rotsch, and Richard W. Fairchild, Asst. Attys. Gen., for appellant.

Stubbeman, McRae & Sealy, of Midland, Martin A. Row and Charles B. Ellard, both of Dallas, and Smith & Smith and Myron A. Smith, all of Ft. Worth, Vernon Coe, Baker, Botts, Andrews & Wharton, R. E. Seagler, and E. E. Townes, Walter H. Walne, and John E. Green, Jr., all of Houston, Warren M. Sparks and E. H. Foster, both of Amarillo, P. O. Settle, Wm. L. Wise, David W. Stephens, Wm. Pannill, and W. E. Allen, all of Ft. Worth, T. H. Neel and J. H. Starley, both of Monahans, J. E. Starley, of Pecos, D. D. Mahon, of Lubbock, Don Emery and Rayburn L. Foster, both of Bartlesville, Okla., and Wolf & Davis, of Chicago, Ill., Major Felix A. Raymer, of Ft. Sam Houston, and H. L. Stone, of San Angelo, for appellees.

PRICE, Chief Justice.

This is an appeal by the State from a judgment of the District Court of Crane County entered on an instructed verdict. The State claimed there was a vacancy be-

tween the west line of Block 32, Public School Land, and the east line of Block B–27, Public School Land. The claimed vacant strip extended the full length of the two blocks and contained about six hundred ten and a half acres of land. Block B–27 lies west of Block 32.

The action was instituted by plaintiff R. N. Flick based on an alleged right to purchase an oil lease as the assignee of two parties who had duly and legally made application to purchase. Among the defendants were Humble Oil Company and the owners of the east tier of sections of Block B–27 and the owners of the west tier of sections in Block 32, and also others who claimed rights in the oil and gas under said strip of land.

The State appeared, intervened and vigorously asserted the alleged vacancy, claiming that the strip in question was unsurveyed Public School Land.

Plaintiff Flick held only the bare legal right to acquire a lease on the vacancy if it existed. He was at all times an employee of the defendant Humble Oil Company; that Company had furnished the money to acquire such rights held by plaintiff, and such rights as he had were held for the use and benefit of that Company. These facts were known to the attorneys for the State at and before the trial of the case. It was the position of the State that the Humble Company, by reason of its application through Flick to purchase the lease on the vacancy, could not be heard to deny that same existed.

If a proper construction of Block 32 fixes its west boundary line at exactly 18 miles from the northeast corner of Block 30, and the east line of Public School Block B—27 is exactly 2,158 varas from the northwest corner of Block B—27 (the mesquite tree corner), the vacancy claimed exists; otherwise, there is no vacancy.

The State asserts that the Corwin survey of Block 32, an office survey, calls for the northwest corner of 32 at an aggregate of 18 miles from the northeast corner of Block 30; as to the east line of B—27 it asserts that while the field notes of that block call for the west line of Block 32, that the call for distance governs, and by that call it falls some —— varas short of reaching the west line of 32. The theory is that when the surveyor called for the west line of Block 32 as the east line of B–27, he was mistaken as to the true location of such west line, hence the call for

distance governs over the call for such unmarked west line.

Block 32 and Block B–27 are within the T. & P. Reservation, being south of the center line thereof. A brief history of the T. & P. Reservation and an account of the survey thereof is deemed necessary to the proper understanding of the issues of this appeal.

On February 4, 1856 the Memphis, El Paso & Pacific Railroad Company was by legislative act incorporated to build a line of railway beginning on the east boundary of the State between Sulphur Fork and Red River, running westerly to the Rio Grande opposite or near the town of El Paso. As a bonus for building said line the Act created a reserve of vacant land within eight miles of each side of the extension of said line as same might be designated by survey, recognition or otherwise. Each alternate section surveyed by the Railroad was donated to the Railroad as a bonus. On February 17, 1857 the Railroad filed in the office of the surveyor of Bexar Land District a map designating the line of recognition as the center line of the Reserve. On June 20, 1857, a copy of this map was filed in the General Land Office.

By an Act approved July 27, 1870, and May 24, 1871, authorization was given to the Southern Transcontinental and Southern Pacific roads to participate in the construction of the road. This act provided for the consolidation of the two companies with the Texas & Pacific Railway, and succession of that consolidated Company to the rights of the Memphis, El Paso & Pacific Railway Company.

A legislative act dated May 2, 1873, recites the legal consummation of the consolidation, and further provided that the portion of the Reserve lying west of the 23rd meridian of longitude west from Washington to the Rio Grande be increased in width from 16 miles to 80 miles, the increase being 32 miles on either side of the line of recognition.

The line of recognition intersects with the 23rd meridian of longitude west of Washington at a point S. 45 E. 7,310 varas from Fort Phantom Hills. The center line was run by the T. & P. from this point on a course of 77° W. for its entire length. The T. & P. Surveys were built from this center line. The mile points on this center line are numbered from the intersection with the 23rd meridian. For the location

of certificates within the Reserve the surveyors for the T. & P. adopted the following plan: The Reserve was divided into blocks 80 miles north and south (40 miles on each side the center line) and 6 miles wide east and west. These blocks were subdivided by the running of township lines parallel with the center line at distances of 8 miles. The field notes of the land taken by the T. & P. were all filed in the Land Office before 1876.

The T. & P. did not apply certificates to all of the land within the blocks constituting the Reserve. It will subsequently appear, it is thought, that the portion of Blocks 43, 44 and 45 lying south of the center, and occupying the space on the center line between mile points 171 and 189, as delineated by the T. & P., have bearing here.

In order to illustrate the T. & P. system of survey, and show the land appropriated within this area by the T. & P., we here reproduce from appellees' brief a sketch of that portion of T. & P. Blocks 42, 43, 44 and 45 lying south of the center line.

SKETCH B

SECTIONS TO WHICH T. & P. R.R. CO. APPLIED CERTIFICATES
(1876)

Where the sketch shows the blocks to be divided into sections, this portion was appropriated by the T. & P. The balance was not appropriated, but rejected, and, after the T. & P. selection, was part of the unappropriated public domain of the State.

The Legislature, by an Act taking effect July 14, 1879, authorized, among other lands, the sale of the unappropriated portions of the Reserve. The Act provided the applicant should have the land surveyed by an authorized public surveyor; further, if the applicant failed to pay the purchase price of fifty cents per acre within sixty days, he should forfeit all his rights and the Land Commissioner might sell the land to any purchaser paying the purchase price thereof.

On April 10, 1882, Gunter & Munson and Maddox Bros. and Anderson filed application with the county surveyor of Tom Green County for the filing, entry and survey, among other lands, of all of the unappropriated public lands lying in T. & P. Blocks 43, 44 and 45 south of the center line of the Reserve. In September, 1882, the land was surveyed for applicants by C. S. Graves, a duly licensed and qualified surveyor. The field notes thereof were duly filed in the Land Office on December 8, 1882. Applicants did not complete their purchase by tendering the purchase price fixed by law. The Land Commissioner did not indicate his approval of the Graves field notes by awarding the land or otherwise expressly approving same. However,. the Graves field notes seem to have been platted on the official map of Tom Green County and on other maps in use in the Land Office. The Graves field notes sectionized the unappropriated lands in T. & P. Blocks 43, 44 and 45 south of the center line, and township subdivision was used.

Graves' field notes intrinsically evidence that his intention was to subdivide the unappropriated portions of the blocks in accordance with the T. & P. block and township designation. He makes numerous calls for adjoinder with the T. & P. survey, fixes sections into the stairstep line remaining after the T. & P. had made its appropriations. Section 30 in his Block 43, Tsp. 6 South, is in conflict with T. & P. Section 34, Block 44, Tsp. 4 South. Probably on account of this error he omits to take up ten sections. All of the Graves' sections are called to be 1900 varas square, and all of his courses are identical with corresponding T. & P. corners.

On April 10, 1883, the Legislature allocated for the permanent endowment of the University and its branches one million acres of land, and for the Public Schools one million acres. It was further provided that land might be taken from any of the unappropriated land specified in the Act of July 14, 1879. This was the Act under which the Graves survey was made and applied to the unappropriated land in T. & P. Reserve. The General Appropriation Bill effective April 23, 1883, for the years ending February 29, 1884, and February 28, 1885, provided for $5,000 for surveying the two million acres of land, same to be paid on the warrant of the Land Commissioner, one half to be charged against the University and one half against the available School Fund.

On May 1, 1883, the Board of Regents of the University by resolution requested the Land Commissioner to set aside and designate the million acres allotted to it. From the records of the University it appears that on June 4, 1883, Regent Wooten reported to the Board that the Land Commissioner informed him that it had been impossible for him to designate and set apart the land for the University, and that on a conference with the Governor it was deemed best to employ an additional draftsman to map and plat the University lands. On August 11, 1883, Land Commissioner Walsh wrote the Regents that for the past six weeks he had an extra draftsman tracing and platting the land on the map.

On August 25, 1883, the State Land Board took action to employ Dennis Corwin to survey and classify the one million acres of land for the University and make return to the General Land Office. There seems to have been no authority in law authorizing that body to take such action. From June 23rd to July 2nd, 1884, Dennis Corwin measured a connecting line from the main water tank on the T. & P. at Monahans to Horsehead Crossing on the Pecos River. The description of this work was sworn to before J. P. Hart, District Clerk of Travis County, and filed in the General Land Office February 25, 1885. In measuring this line Corwin came within about two miles of Section 32, Public School Land. Corwin was a surveyor, but under the law was not an authorized official surveyor in the Tom Green County Land District.

Corwin seems to have been employed and paid by the Board of Regents to inspect, re-

port on, and make recommendations as to the land allocated to the University.

On January 9, 1885, the Land Commissioner worte Corwin a letter, as follows:

"I have waited until the present moment to receive such report as you desired to make under your employment by the University Regents as to the character of land to be designated for the common schools and University. I cannot wait any longer and shall begin apportioning the land as contemplated by law and award to each fund the best land I can from the information I possess.

"If you have any suggestion I would be happy to receive it."

On January 12, 1885, Corwin filed in the Land Office purported field notes for 77 blocks of land within the Reserve. Blocks 1 to 51 were designated for the University; 52 to 77 for the Public Schools.

On Corwin's block descriptions of Blocks 1, 2, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 30, 31, 33, 34, 35, 36, 37, 38, 39, 41, 44, 46, 48, 49, 50 and 51, there is found the notation "O.K." On his description of Blocks 26, 27, 28, 29, 32, 40, 42, 45, and 47, there is noted the following: "Cancelled for University but taken for Public School Fund." Neither of these notations is dated, and by whom made does not appear.

These field notes are signed by Dennis Corwin, Surveyor, but there is no certificate as to their correctness. It is not stated upon what authorization the lines are run. In fact, all parties to the litigation concede that Dennis Corwin did not make an actual survey of the land. In short, the purported survey was an office survey. As being typical of the Corwin field notes, and because they have important bearing on the issues of the case, we here set forth the field notes of Blocks 30 and 31, University, and Block 32, Public School Land:

"Block No. 30: Beginning on the S.W. corner of Block No. —— Township No. 4, South Texas & Pacific; Thence S. 13° E. eight (8) miles; Thence 77° W. six (6) miles; Thence N. 13° W. eight miles; Thence N. 77° E. six (6) miles to the place of beginning.

"Block No. 31: Beginning on the N.W. corner of Block No. 30, University land; Thence S. 13° E. eight (8) miles; Thence S. 77° W. six (6) miles; Thence N. 13° W. eight (8) miles; Thence N. 77° E. six (6) miles to the place of beginning.

"Block No. 32: Beginning on the N.W. corner of University Block 31; Thence S. 13° E. eight (8) miles; Thence S. 77° W. six (6) miles; Thence N. 13° W. eight (8) miles; Thence N. 77° E. six (6) miles to the place of beginning."

It will be noted that the block number, the beginning point of 30, is omitted and only appears from Corwin's map, which will be hereafter referred to. This beginning point as shown by the map was the S.W. corner of Block 42, Tsp. 4 South. This point is well established on the ground and is conceded to be correct by all of the parties hereto.

Corwin's Blocks 30 and 31, University, 32 Public School, 33 and 34, University, are all constructed from this beginning point; that is, the S.W. corner of Block 42, Tsp. 4 South, which is the N.E. corner of Corwin's Block 30, University.

There has long been in existence and in use in the Land Office what is denominated as "Corwin's Map." This map is signed by Dennis Corwin, but bears no file mark. Block numbers the same as those in Corwin's field notes appear on the map. These blocks are shown on the map as divided into numbered sections. Whether or not the section lines and numbers were placed there when Corwin filed the map is not shown. Here is reproduced a copy of such map.

An examination of this map will show, the T. & P. block lines as extended. The north line of Block 30 is coincident with the south line of Block 34, Tsp. 4 South. The west boundary line of Block 30 is an extension of the east boundary line of Block 44, T. & P. The north line of 31 is coincident with the south boundary line of Corwin's Block No. 33, University. The north boundary line of his Block No. 33 is coincident with the south boundary line of T. & P. Block 43, Tsp. 3 South. In short, in the relevant area wherever any of this work of Corwin's is shown by the map to adjoin the T. & P. blocks and sections, it is coordinated therewith.

The Corwin plat is not a literal depiction of the so-called Corwin field notes. Corwin's field notes give no variation. Hence, if the lines were run in accordance therewith from the beginning, if platted literally, serious conflicts would arise with the previous T. & P. Surveys, the lines of which were run on a variation of 12°. The Corwin map on the whole shows block and section lines to run in harmony with the T. & P. lines.

■ The State does not contend that the north boundary of Blocks 30, 31 and 32 should not be run on the same variation as the T. & P. block lines and coincident

378

therewith. The contention is that the width of each block is exactly six miles—six miles because this is the distance called for in the field notes of Corwin. This, we think would be true if we must look to the field notes alone in determining where the west line of Block 32, Public School Land, is located on the ground. For the Corwin field notes to control, an adoption thereof by the Land Commissioner must be shown, we think, for to him was entrusted the power and duty of selecting and designating the lands allocated to the University and Public Schools, respectively. Unless an adoption of such field notes is shown, same are not binding. These field notes are not intrinsically valid, because the survey was unauthorized by law; further, not made by one authorized by law to make an official survey in the District. The field notes are ambiguous, in that it is impossible to apply same to the ground without reference to the map. There are no field notes of any sections. For the sections and their numbers, this map and this map alone must be looked to.

The Commissioner of the Land Office did not deem a new survey necessary to select these lands for the Public Schools and the University. His official correspondence evidences this. If the work could be done by a draftsman, as suggested by this correspondence, the Graves field notes were the only data in the Land Office from which this could be done.

■ Now the Corwin map had been platted on numerous official maps of the relevant area. Numerous sales have been made of lands in Block 32 in accordance with the section numbers shown on Corwin's map,—in accordance with the block numbers shown on Corwin's map. In our opinion, however, this falls short of approval by the Land Commissioner of the Corwin field notes as to Blocks 30, 31 and 32. It amounts rather to an adoption and approval of the Corwin map.

We have stated that the so-called Corwin map is not a true depiction of the Corwin field notes. The Graves field notes were probably platted on the official map of Tom Green County before the Corwin map was in existence. According to the testimony of Mr. Walker, former Land Commissioner, this was the only such map in the Land Office that was compiled under the direction of the Land Commissioner for the purpose of making selection of University and School Lands appropriated under the Act of April 10, 1883.

When we carefully examine the so-called Corwin map, it is found to be nothing more than a reproduction of the platting of the Graves field notes. This must be so because the Corwin map shows the same conflicts and the same omissions as the Graves field notes.

In the last analysis, the Corwin map is a depiction of the Graves field notes as to the area involved with changes as to block numbers and the omission of the Graves' section numbers. This map shows the blocks and their component sections were established with reference to the T. & P. surveys and coordinated therewith. It is undisputed there is an excess of about 20 varas to the mile in the T. & P. surveys as same were established by actual surveys. This excess should be given to the north line of Blocks 30 and 31, in any event. Under the undisputed testimony if the excess in the T. & P. blocks with which Blocks 30 and 31 are coordinated, the vacancy claimed does not exist.

The Corwin field notes are unauthorized, incomplete, impossible of application to the ground without reference to the Corwin map. This map, in connection with the unquestioned adoption of same, furnishes the best evidence of the lands selected and designated by the Land Commissioner and the boundaries thereof. That it is sufficient for this purpose we have no doubt. Boon v. Hunter, 62 Tex. 582; Huff v. Crawford, 89 Tex. 214, 34 S.W. 606; Burkett v. Chestnutt, Tex.Civ.App., 212 S.W. 271; Finberg v. Gilbert, 104 Tex. 539, 141 S.W. 82; Stover v. Gilbert, 112 Tex. 429, 247 S.W. 841; Pritchard v. Burnside et al, 140 Tex. 212, 167 S.W.2d 159; Carter v. Elk Coal Co., 173 Ky. 378, 191 S.W. 294.

■ Block B–27, Public School Land, the east boundary of which forms the west boundary of the alleged vacancy, was surveyed by W. D. Twichell, a State Land Surveyor appointed by the Land Commissioner under the Act of February 23, 1900, Laws 1900, First Called Sess. c. 9, allocating certain unappropriated lands to the public schools and authorizing a survey thereof. This survey was made in the year 1902. Land Commissioner Rogan gave Twichell a letter of direction as to how the surveys were to be made. This letter is as follows:

"We send you by mail, this date, sketch of public domain and surrounding surveys in Ward, Winkler and Crane Counties.

"As no corners were established on the ground for the surveys on the West of the vacancy, you will identify the corner of No. 1, Blk. 'A', Maddox Bros. & Anderson, at Sand Hill station, or of No. 60 at Monahan, and run out the surveys on the West as you understood before leaving Austin.

"The surveys on the East of the vacancy, mostly T. & P. R. R. Co. surveys, give no corners in field notes in this office, but the Texas & Pacific R. R. has established corners on the ground, descriptions of which have not been furnished to this office.

"You will be enabled to find corners of No. 22, Blk. 46, Town 1, North, by Wood's connection from S.E. corner of New Mexico, also corners S. 13° E of same (or really S 15° E). Possibly you will find these corners continuing to Blk. 43, Town 4 South, if not, the surveys will have to be placed by course and distance.

"University Blocks 32, 31 and 30 connect with the T. & P. surveys on the North as represented in sketch. No corners of University on ground and they will be surveyed on the ground according to calls.

"After establishing University Blocks 30, 31 and 32, you will be able on the ground to identify some of the corners of the H. & T. C. R. R. work on the Pecos.

"After identifying said work, H. & T. C. R. R. on Pecos, you will connect with University Blocks 32, 31 and 30, also with Block 'N', Gunter M. M. Bros. & Anderson, or Sand Hill Station.

"This will have completed the circuit around your entire work for these counties and will have consumed most of your time.

"You can then run one or two lines across the vacancy, establishing good corners, and this is a special instruction of the Commissioner in order to enable you to complete the work in the time allotted."

The sketch referred to in the letter accompanied same. This sketch, as to the area relevant here, is a practical reproduction of the Corwin map, save Corwin's Blocks 33 and 34, University, are omitted therefrom, as is also Block 49. These omitted blocks were, after the Corwin map was filed, lifted by the Land Commissioner and located elsewhere. This, perhaps, accounts for their being omitted from the sketch.

Twichell in making his survey ran on the center line between mile post 176 and 192. Beginning at mile post 189 on the center line he ran south to the northeast corner of his Block B–21; from that point east to a point in the west line of Block 42, Tsp. 4 South, and from that point south to the northeast corner of Block 30. He also surveyed on the ground the west lines of Block B–21 and Block B–27. His north and south lines were run at right angles to the center line and his east and west lines parallel thereto. On the center line he found an excess of about 20 varas to the mile. He made his sections fit by giving the excess to the sections that adjoin senior surveys. To Block 30, shown on Corwin's map, he gave the excess he found in T. & P. Block 43 lying just north of it. No excess was given to 31 or 32. He thought the east line of Block B–27 should be 257 varas east of and parallel with the west line of T. & P. Block 45 extended. As has been stated, he established the northwest corner of Block B–27 and ran the west line of that block. His east tier of sections in Block B–27 call for the west line of Block 32, Public School.

On the sketch furnished Twichell Blocks 33 and 34 were omitted. The area was shown as unsurveyed, unappropriated land, 33 lying immediately north of 31 had been lifted.

The Corwin map, the prime evidence of the location of Blocks 30, 31 and 32, shows the north boundary line of 33 to be the same as the south boundary line of T. & P. Block 44, Tsp. 3 South. Corwin's map likewise shows University Block 35 as the unappropriated portion of Block 44, Tsp. 3 South, with the lines coordinated with the appropriated portion of said Railroad block.

We think neither the ignorance of Twichell of the prior location of Block 33, nor subsequent action of the Land Commissioner, could deprive the location of that block of its evidentiary value in determining the location and width of University Blocks 30 and 31. Even though the location of University Blocks 30 and 31 and Block 32, Public School Land, and University Blocks 33, 34, 35 and 36, was by platting rather than survey, their establishment was contemporaneous and the work was all connected. The location of any one of these blocks has bearing and influence on the location of the others. Standefer v. Vaughan, Tex.Civ.App., 219

S.W. 484; Brooks v. Slaughter, Tex.Civ. App., 218 S.W. 632; Beck v. Gulf Production Co. 113 S.W.2d 258, writ refused; Stanolind Oil & Gas Co. v. State, 129 Tex. 547, 101 S.W.2d 801.

Giving 30 and 31 the conceded excess of the adjoining T. & P. blocks, the west line of Block 32 is west of the east line of Block B-27. If we locate the east line of Block B-27, 2,158 varas from the "mesquite tree corner," as contended by the State, a conflict rather than a vacancy arises.

Twichell's field notes call for the west line of senior Block 32 as the east line of Block B-27. Twichell did not measure from the "mesquite tree corner" to the northeast corner of Block 30, University. He calculated the distance. Beyond question he knew the location of the northeast corner of Block 30, University. It may be that he was mistaken as to the true location of the west line of Block 32. If so, his mistake was that by his distance call he placed same too far east.

■ If we should be mistaken in this holding, Twichell's call for the west line of Block 32 is a locative call. If his distance call fails to reach there, then in the application of his field notes to the ground, an ambiguity appears. Then the question to be decided is, which call best reflects the intention of the surveyor. Under ordinary circumstances, the call for course and distance would yield to the call for adjoinder. This is subject to the qualification that where the call for adjoinder is made through a mistake as to the location of the line of the adjoining survey, then this rule does not necessarily apply. On the other hand, if there are other elements in the survey, considered in the light of all facts and circumstances in evidence, showing the call for adjoinder, though mistaken, more truly reflects the intention of the surveyor than the call for course and distance, then such call is not necessarily controlling. Stanolind Oil & Gas Co. v. State, 129 Tex. 547, 101 S.W.2d 801.

■ Twichell was endeavoring to survey for the Public Schools all of the unappropriated land in the T. & P. Reservation generally delineated in his instructions from the Land Commissioner. The underlying purpose of the Legislature authorizing the survey was that the proceeds of the sale of the land might be made available to the Public School Fund. The intention of Twichell to include in his B blocks all unappropriated land within the Reservation is evidenced by his inclusion of Blocks 33 and 34, shown on the Corwin map, but not on the sketch furnished him by the Land Commissioner.

It abundantly appears from the survey as a whole that he was endeavoring to locate his B blocks in coordination with the prior T. & P. surveys adjoining. The general intention was to completely subdivide an area with reference to the adjoining prior appropriations. A failure to include this small strip would be out of harmony with the whole purpose of the survey. Regardless of whether Twichell did or did not think the T. & P. excess should be given to 30, but not to Blocks 31 and 32, the leaving of this small strip would be out of harmony with the basic purpose of the survey. But for the discovery of oil adjacent to this area, this alleged vacancy would be without benefit to the State. The land at the time of the survey was fit only for ranch purposes and relatively of small value. Its existence would probably detract from the sale value of the lands included in Block B—27 and Block 32.

Under the circumstances as disclosed by the record, we are of the opinion that even if the Corwin field notes definitely fix the northwest corner of Block 32 eighteen miles from the northeast corner of Block 30, the call in the Twichell field notes of Block B-27 for the west line of 32 should govern over the call for distance. Stanolind Oil & Gas Co. v. State, 129 Tex. 547, 101 S.W.2d 801.

However, we have no doubt that Blocks 30 and 31 take the excess appearing in the T. & P. blocks with which by the Corwin map they are connected. This being true, the west line of Block 32 is coincident with or west of the east line of B-27. If this be true, the claimed vacancy does not exist.

■ One other matter is involved in this appeal. From the fact that the Humble Oil Company caused plaintiff Flick to acquire the right of applicants to the lease and caused Flick to sue it in vindication of this right, it is asserted that the Humble is debarred from asserting any right in the area involved. Before the case went to trial Flick had abandoned any claim to the land. Defendant Humble Oil Company had as a matter of fact abandoned any assertion of claim under Flick. The application to purchase by the said defendant

through Flick could not at the time same was acquired form a basis of assertion in court of a right to purchase until the application had been granted by the Land Commissioner. This the Land Commissioner never did. In 1939, Acts 1939, p. 465, § 1, Vernon's Ann. Civ.St. art. 5421c, § 6, the Act relating to the purchase of Public School Land was amended so that one claiming under an ungranted application was given the right, and in fact required, to test his right to purchase within a limited time or lose same. Before the amendment an ungranted application might indefinitely cloud the title of a prior purchaser.

After the amendment of 1939 the Humble Oil Company procured Flick to file suit against it and others. Insofar as the suit was against the Humble Oil Company, it manifestly was a fictitious suit. It should not have been filed. The fact that through some such means was the only way that Company might clear its title may palliate, but does not excuse, the wrong in filing this fictitious action. However, the State was in no way harmed thereby. Long after its responsible officers in charge of the litigation had notice of the fact that the Flick suit was not in good faith, their election was to seek to recover the area from the Humble and the other defendants. It would be harsh and formalistic to decree a forfeiture of any right it may have had in this land where no one was in any way damaged by the conduct complained of. There is no law authorizing such a decree on the part of the trial court. No doubt had there been a question of fact as to the boundary under the evidence, it might have had an evidentiary bearing. There was no question of fact tendered. It is shown as a matter of law that no vacancy exists. The trial court did not let the matter go unnoticed and unrebuked. All costs were taxed against the Humble Oil Company. It has not complained thereof.

It is true that where there is no other evidence on the question of the existence of a vacancy and it is proved the one asserting no vacancy has applied for the right to purchase and asserting rights thereunder, that this in and of itself may be sufficient to establish the vacancy against the party asserting same. As has been pointed out, this is not the case here. The evidence shows as a matter of law there is no vacancy.

The case is affirmed.