**Guerry M. STRONG, Appellant,**

v.

**DELHI–TAYLOR OIL CORPORATION et al., Appellees.**

**No. 142.**

Court of Civil Appeals of Texas.

Corpus Christi.

June 23, 1966.

Rehearing Denied Aug. 4, 1966.

Pat Holloway, of Holloway & Simmons, Dallas, for appellant.

Neal King, of Hill, King & McKeithan, Harry Hall, Mission, Robert C. McGuire, of Turner, Atwood, Meer & Francis, Dallas, for appellees.

## OPINION

NYE, Justice.

This is a vacancy suit. Appellant filed suit in the District Court of Hidalgo County,

Texas alleging that there is in existence vacant and unsurveyed public free school land constituting a vacancy within the meaning of Article 5421c, Vernon's Ann.Civ. St. The proceedings in the district court were instigated by the appellant following the order of the Texas Land Commissioner who had determined that "no vacancy" existed on the lands in question. The Commissioner appointed a licensed state land surveyor in accordance with the law to survey the land in question. At the hearing before the Commissioner, no evidence was allowed except that of the appointed surveyor who testified and filed numerous exhibits. One plat was filed by the surveyor at the request of the Commissioner, which showed no vacancy.

The appellant in his original petition named as defendants, Delhi-Taylor Oil Corporation, 1224 additional other defendants, the United States of America, Jerry Sadler, Commissioner of the General Land Office of the State of Texas, and the unknown heirs, stockholders, beneficial interest-holders in the property and lands described, etc. Some, but not all of the defendants filed a Motion for Summary Judgment which was controverted by the appellant. After the hearing on defendants' motion for summary judgment, and after entertaining both oral argument and written briefs, the court announced that it had considered the exhibits filed therewith, and those in opposition thereto, including the depositions and affidavits on file, and determined that the plaintiff's alleged cause of action was as a matter of law without merit as against all defendants, movants and non-movants alike. The plaintiff has perfected his appeal to this court.

Appellant's basic contention in this case is: that the east line of Porcion 72 and the west line of Los Torritos Grant was not contiguous and that vacant land exists between such lines. Appellant also contends that a vacancy exists between the north line of Porcion 72 and the south line of the R. J. Swearingen Tract to the north. Appellant's first point is that the trial court erred in granting appellees' (defendants) motion for summary judgment because there was evidence before the court of the existence of vacant lands between the east line of Porcion 72 and the west line of Los Torritos Grant. The lands in question, although at one time were in Cameron County, are situated in Hidalgo County.

None of the original monuments on the ground to Porcion 72 and none of the original monuments to the grants which surround this porcion, including the location of the Rio Grande River in 1767 can be found today. Appellant admits that all of these monuments of the original surveys have disappeared except as to the beginning point of the 1767 survey of Porcion 72 which he contends that the state appointed surveyor Byron L. Simpson has located by following the footsteps of the original surveys from the calls contained in the original field notes of 1767. Basically, it is appellant's contention that because no patent has ever issued to Porcion 72, those claiming title under the original Spanish grant of Porcion 72 are necessarily limited to the evidence of the Spanish grant of Porcion 72 as surveyed in 1767. Insofar as a determination of the boundary lines of Porcion 72 is concerned, appellant argues and the appellees agree, that the only legal relevant inquiry is the location of such grant as surveyed by the Spanish surveyors in 1767. Surveyor Simpson has attempted to locate Porcion 72 by course and distance from where he contends the beginning point was in the original survey in the year 1767, and by such construction he locates Porcion 72 in such a manner as to create a vacancy between Porcion 72 and Los Torritos Grant to the east. (See Plat 3.) [1]

1. No particular effort has been made on our part to adhere strictly to scale on the three plats, but they give a fairly accurate picture of the layout of the land.

PLAT 3

Tex Mex. 290

Tex. Mex. 268

R B CURRY

R. J. SWEARINGEN

71 A 72

PORCION 71
O-N-K-A

PORCION 72 TODAY
A-K-I-J

PORCION 72 AS
APPELLANT CLAIMS
FROM 1767 SURVEY
L-M-DC

PORCION 72 AS
APPELLANT CONSTRUCTS
IT FROM PATENTED 71
G-K-I-H

LOS TORRITOS GRANT

SANTA ANA GRANT

EAST BOUNDARY
LINE OF PORCION 71
AS PATENTED
A-K

35,500 VARAS TO CENTER
OF PLAZA OF Reynosa Viejo
AS MEASURED BY SURVEYOR
SIMPSON TO LINE C-D

APPELLANTS
CONSTRUCTION
OF WEST LINE
TORRITOS
F-E

WEST LINE
OF LOS TORRITOS
AND EAST LINE
OF PORCION 72
J-I

Stewart ROAD

RIO GRANDE RIVER

APPELLANT CONSTRUES VACANCY TO BE
THE AREA INSIDE A-B-C-D-E-F
OR A-G-H-I-E-F EXCLUDING
CITIES.

-3a- PLAT 3

NOT DRAWN TO SCALE

The appellees contend: that surveyor Simpson did not locate the beginning point nor was he able to follow the footsteps of the original surveyors in 1767; that summary judgment for the defendants is justified because it is impossible for the appellant ever to sustain his burden of showing by legally competent evidence where the alleged vacancy is; that Porcion 72 and the Los Torritos Grant are tied together as a matter of law; and that the land declared by appellant to be vacant, is as a matter of law titled land and is not vacant as defined by the Vacancy Act. We sustain these contentions of the appellees and affirm the judgment of the trial court.

The basic document which appellant relies upon, is the "Acts of the General Visit to Reynosa". This is crucial to the appellant's ability to retrace the steps of the original surveyors. It therefore becomes extremely important at the outset to review historically the manner in which these grants of land originated.

The Act of the General Visit called the "Visita" shows that in 1767 agents of the Viceroy on the authority of the King of Spain arrived in Reynosa to make the first grants of land to the individual registered settlers in that area. These visits by the Royal Commissioner established jurisdictions along the Rio Grande River apparently beginning near Laredo and proceeding eastward toward Reynosa. An Act was adopted on the 24th day of April, 1871 by the Legislature of Texas (Laws of 1871, p. 56, c. 53) entitled "An Act to provide for the obtaining and transcribing of the several Acts or Charters founding the Towns of Reynosa, Camargo, Mier, and Guerrero, in the Republic of Mexico, and of Laredo in Texas * * *." Paschal's Digests, Art. 5826. It is from this translation by John S. Haynes, agent appointed under this Act that we quote and rely.

The jurisdiction of Camargo was downstream from Laredo and was apparently laid out in 1767 at or about the same time as the jurisdiction of Reynosa. See State v. Valmont Plantations, Tex.Civ.App., 346 S.W.2d 853, for historical reference. As was said in Sullivan v. Solis, 52 Tex.Civ. App. 464, 114 S.W. 456, by Justice Fly, the surveyors of Camargo (the townsite west of Reynosa):

"* * * had gone to the boundary marked out for the town, which adjoined the boundary of Reynosa, and calculated the depth of the grant, which was five leagues. They then 'stretched the cord from east to west along the margin of the Rio Grande del Norte and with 23 cords and 30 varas for each end and 25,000 varas in depth,' which constituted the first porcion * * *." of Camargo.

This would be the western limits of the jurisdiction of Reynosa.

The "Visita" of Reynosa provided that, the citizens of Reynosa:

"* * * convene after Morning Mass, through the medium of the Captain, in order to appoint two Experts for the purpose of classifying the lands in reference to those that are irrigable and those that are temporarily irrigable and suitable for cultivation, grazing, pasturage, commons, and those suitable for the Town, for the purpose of giving them an equitable distribution, that all may share in the good and bad, * * *."

The citizens of the town petitioned the Royal Commissioners as follows:

"* * * That your Worships may be pleased through the grace of His Majesty (whom God protect) to order that the lands of this Town be designated and divided among its inhabitants giving to each a possession, and we entreat Your Worships may be so generous as to devide them in such a manner as to compensate for deficiency of water which

these lands suffer for cultivation, and so as to extent them in such a way as to encourage the growth of our stock, which we possess in a small degree for our maintenance calling the attention of Your Worships to the fact that these lands are of little value on account of the dense woods which exist thereon, and the plains upon which to pasture our stock being limited, especially those on the North bank of the River, (*the Texas side*)[2] so much so on account of their small value as the dangers which are presented by the Pagan Indians and the necessity of caution in the lands they inhabit; on which account we supplicate Your Worships to please order that the greater part of the lands be adjudged to us on the South side of the River (*Mexico*)[2] and also that Your Worships will consider the many embarrassments presented by the River in crossing, either from the want of canoes, the expense of which cannot be suffered by many poor people, or the River being much of the time very high, and the lack of spiritual consolation."

Surveyors were appointed and ordered that they:

" * * * shall proceed to stake and mark out six leagues (*lineal*)[2] around about this Town, *counting from its center,*[2] which we assign as its boundaries, within which shall be verified the said partition, unless in running the lines they should encounter the boundaries of another Town, when they shall stop in consequence thereof, and with due regard to the rights and privileges of the settlers, * * *."

On the 26th day of August, 1767, the declaration of the surveyors stated that:

" * * * they had gone out on the same evening to mark the boundary assigned to the Town, and using the cord composed of fifty Mexican varas, and bearing in the direction towards the west, they stretched it *from the center of the Town*[2] one hundred times, which make five thousand Mexican varas and form one league with which they reached the place called *El Desierto* (*western limit of the town commons*)[2] in front of the Ranch of Xavier Zamora; * * * and with fifty seven lengths of the cord to the demarcation and boundary of the Town of Camargo, which they marked and staked where it was before, the Captain and some citizens of the said Town assisting to do so, and this obstacle prevented them from continuing any further; *they returned to the Town*[2] and bearing towards the East, they stretched the said cord from its center one hundred times which brought them to a place called *Ramiditas* (*the eastern limit of the town commons*)[2]. * * *

" * * * and from its (*town*)[2] center towards the South they stretched one hundred times, to wit, with a cord fifty Mexican varas in length, and with one hundred cords which make five thousand varas and one complete league they reached a place called *Berendas,* (*southern limit of the town commons*);[2] * * * after which *they returned to the Town, and on the other side of the Rio Grande at its margin, running North,*[2] they stretched the cord one hundred times in the direct course and thus found the required league at the edge of a plain which they call *Santa Gertrudes* (*the northern limits of the town commons*)[2] ; * * *." See Plat 1.[3]

2. Emphasis and/or words within the parenthesis supplied wherever this footnote appears in this opinion.

3. No particular effort has been made on our part to adhere strictly to scale on the three plats, but they give a fairly accurate picture of the layout of the land.

PLAT 1

A to B 10,000 VARAS
C to D 11,350 VARAS

DIAGRAM NOT DRAWN TO SCALE

We know the original townsite was on the river bank in 1767 because the above quoted measurement of the northern extent of the jurisdiction of the town and also of the Town Commons. Though ordered to begin from the center of town it was said to have begun from the north bank. It appears that the distance from the center of the town "de su centro" of Reynosa to the north bank of the Rio Grande River was ignored. This "Town" is now called Reynosa Viejo (old Reynosa) and it exists today, although it is some thirteen miles upstream from the Mexican city of Reynosa as we know it today.

After the jurisdiction of Reynosa was marked off, the viceregal agents set aside as Town Commons (Ejidos in Spanish, and commonly so-called) an area one league in each direction from the center of town, (the legal description is set forth above) to the four points previously described by the surveyors as being located at 5,000 varas from the center of the "Town"—El Desierto, Ramaditas, Berendas and Santa Gertrudes. See Plat 1.[1] This Ejidos was supposed to be 10,000 varas square.

"In consequence of the result of the foregoing proceedings, we declare and set apart as the Boundaries of the Town Commons (Los Ejidos) as commons, pastures and estates of the Town, one league round about, counting from its center (su centro)[2] * * *.

" * * * The Surveyors shall proceed at once to survey and set apart to each of the Ninety two registered citizens their respective Porcions * * *; and this being done, they shall proceed to survey the Public Square, taking into consideration its circuit and the vicinage, assigning them Town lots under the stipulations and conditions as below shall be prescribed."

The Viceroy's agents then ordered the porciones laid out for the townspeople. Porciones Nos. 1 to 37, inclusive, were then surveyed by one team of the surveyors,

all on the right (or southerly) side of the Rio Grande in what is now Mexico, measuring from the eastern limit of Reynosa's previously measured jurisdiction, westerly.

The first 27 porciones were all measured "along the margins of the (or said) river." The next ten porciones, Nos. 28 to 37, inclusive, abutted on the south end of the Ejidos. But oddly enough, the combined width of these last ten porciones was 11,350 varas, and they somehow fitted across the back of an Ejidos prescribed to be 10,000 varas square.

The degree of accuracy of the measurements of this team on the south bank is then described by the Commissioners, on the relation of the two men who made them:

"Which thirty seven porciones they have surveyed and marked out as they have stated in writing and in consideration of the rights of merits of the settlers and their observance of instructions given them, except in such places where the density of the woods rendered them impassable and may have caused some excess or diminution * * *."

At the same time that this two-man team was measuring off the 37 porciones on the south side of the Rio Grande, the other team was working with the same sort of rope on the left (now Texas) bank. Starting at San Miguel de las Cuevas on the western boundary of the jurisdiction of Reynosa which adjoined the easterly jurisdiction of the town of Camargo, they measured easterly ten porciones—Nos. 38 through 47—and then, arriving at the western boundary of the part of the Ejidos which lies north of the river, they skipped over the Ejidos and started again from the east side with Porcion 48. They then continued to lay out Porciones 48 to 72 consecutively from west to east. Each one was measured along the "margin of said river." The call depths—a uniform 25,000 varas—were not measured, just called for. See Plat 2.[1]

1. See note 1 on page 357.

2. See note 2 on page 357.

PLAT 2

Then they laid out eight porciones, Nos. 73–80, abutting on the north side of the Ejidos. These, unlike the ten porciones abutting on the south side of the Ejidos, have a combined width equal to the 10,000 varas call width of one side of the Ejidos. These surveyors, like the other two, recognized at least one of their limitations:

"Which eighty Porcions they have surveyed and marked out as they have already stated and in accordance with their instructions received and the Acts they have heard, *except in one or another where the bad condition of the land may have caused an excess*; * * *6."

The next proceeding was the laying out of the public square (plaza). This was laid out as a 100-vara square, bordered all around by a ten-vara-wide street and faced on the east by the church.

"In the same Town on the Thirty first day of August One thousand seven hundred and sixty seven, we proceeded with the Surveyors Don Jph. Longoria and Don Jph. Maria Balli to examine the site destined to serve as the Public Square and in proportion to its circuit and the vicinage we caused it to be surveyed one hundred varas square and it was thus staked and marked out, leaving two streets, each ten varas wide, at each of the four corners; and on the front which is on the East course the Church shall remain. * * *"

Nothing in the document suggests the relative locations of the plaza or the starting point for most of the prior measurements— "*su centro*"6 its center, referring to the already existing town.

Porcion 72 is the easternmost of those grants in the jurisdiction of the Spanish town of Reynosa which were located on the north side of the Rio Grande, and was surveyed and granted as a part of the Act of the General Visit of Reynosa in 1767. The field notes of Porcion 72 as contained in the Act of the General Visit are as follows:

"Continuing the same course (East)6 and margins of the said River, there were measured twenty five cords, each fifty varas long, making in all one thousand two hundred and fifty Mexican varas which with an equal number on the opposite headline and twenty five thousand in depth comprise a Porcion like the one just preceding, it was marked out, and Joseph Maria Balli, an old settler, to whom it was adjudicated for the reason assigned in those foregoing."

About eighty-three years later, because of the confusion as to title ownership in the area between the Nueces River and the Rio Grande, the Legislature in 1850 passed an act (3 Gammel's Laws of Texas, pages 582–587) appointing a commission to investigate the titles in such areas. Commissioners Bourland and Miller took testimony and held hearings in various towns between the Nueces and Rio Grande, and filed their report with the Legislature. Thereafter, the Legislature, by the Act of February 10, 1852, (Gammel's Laws of Texas, Vol. 3, p. 941; Paschal's Digest of the Laws of Texas, Vol. 1, p. 734, Art. 4461) confirmed the title to many of the Spanish and Mexican grants in this area, including the Spanish grant of Porcion 71 and Porcion No. 72. This Relinquishment Act did not contain specific metes and bounds descriptions of the grants confirmed, but merely gave the names of the grants involved and the names of the original grantees. It reads as follows:

"CHAPTER LXXI.

"An Act to relinquish the Right of the State to certain Lands therein named.

"Section 1. Be it enacted by the Legislature of the State of Texas, That the State of Texas hereby relinquishes all her right and interest in the following described lands to the original grantees

6. Emphasis and/or words within the parenthesis supplied.

thereof, their heirs and legal assigns, to wit:

\* \* \* \* \* \*

"COUNTY OF CAMERON

\* \* \* \* \* \*

"(16) Jose Maria Balli, porcion seventy-two, Reynosa;

(22) Narciso Cabazos, porcion seventy-one, Reynosa; \* \* \*."

Section 2 of the Relinquishment Act of February 10, 1852, under which Porcion 72 and the other numbered porciones to the west were confirmed, provides as follows:

"That it shall be the duty of those claiming any of the lands named in this act, to have the same surveyed by the District or County Surveyor of the County in which the same may be situated, and upon the return of the field-notes thereof to the General Land Office, the Commissioner is hereby authorized and required to have the same plotted on the maps of his office, and issue patents for the same in accordance with existing laws: provided, that no patent shall issue for a less amount than the original grant."

Four different sets of field notes of re-surveys of Porcion 72 were filed in the General Land Office between June 26, 1878 and March 3, 1884.

Section 8 of Article 14 of the Texas Constitution of 1876, Vernon's Ann.St. provides as follows:

"Persons residing between the Nueces river and the Rio Grande, and owning grants for lands which emanated from the Government of Spain, or that of Mexico which grants have been recognized and validated by the State by Acts of the Legislature, approved February 10th, 1852, August 15th, 1870, and other acts, and who have been prevented from complying with the requirements of said acts by the unsettled condition of the country, shall be allowed until the first day of January 1880, to complete their surveys, and the plots thereof, and to return their field notes to the General Land Office; and all claimants failing to do so shall be forever barred; provided, nothing in this section shall be so construed as to validate any titles not already valid, or to interfere with the rights of third persons."

■ It has been settled that failure to comply with the above-quoted constitutional provision and failure to obtain a confirming patent under the Relinquishment Act of February 10, 1852, does not thereby render a valid Spanish or Mexican grant void.

The effect of the Relinquishment Act of 1852 was to recognize the validity of the (Spanish or) [7] Mexican grant and render the title perfect as against the State. Clark v. Hiles, 67 Tex. 141, 2 S.W. 356. As was stated by our Supreme Court in State v. Balli, 144 Tex. 195, 190 S.W.2d 71:

"Failure to make surveys and file field notes as required by the second section of the Relinquishment Act of February 10, 1852, and by Section 8 of Article 14 of the Constitution of 1876 has never been accorded the slightest importance either by the political authorities of Texas or by the courts." (Citing cases.)

Mr. Justice Bradley remarked in Gonzales v. Ross, 120 U.S. 605, 7 S.Ct. 705, 717, 30 L.Ed. 801, 809:

" \* \* \* A man whose title was good in 1876, when the constitution was adopted, whether his muniments of title were on record or not, could not be deprived of it by a simple ipse dixit of the constitution any more than by a legislative act. \* \* \*"

In discussing the lack of importance of these surveys our Supreme Court quoted with approval State v. Sarnes and Lang-

---

7. Emphasis and/or words within the parenthesis supplied.

deau v. Hanes in State v. Balli, supra, as follows:

> "[In the case of] State v. Sarnes, 47 Tex. 323. The court say: 'The object of the survey required by the 8th section of the act (of August 15, 1870), is to identify the boundaries of the tract of land previously surveyed, so that the surveys may be identified by appropriate calls, in connection, with or in reference to other surveys, or fixed and known objects, and be placed on the county map in the General Land Office. This could not be done *without another survey, as there was no* necessary connection kept up, in the Mexican plan of making surveys, but each tract was identified by calling for the name of a place informally, and sometimes by calling for an adjoining tract by its name.'" [8]

As was stated by the Supreme Court of the United States in Langdeau v. Hanes, 21 Wall. 521, 88 U.S. 521, 530, 22 L.Ed. 606, speaking of a congressional act of confirmation containing a similar provision for a survey:

> "In the present case the patent would have been of great value to the claimants as record evidence of the ancient possession and title of their ancestors and of the recognition and confirmation by the United States, and would have obviated, in any controversies at law respecting the land, the necessity of other proof, and would thus have been to them an instrument of quiet and security. But it would have added nothing to the force of the confirmation. The survey required by the patent was only to secure certainty of description in the instrument, *and to inform the government of the quantity reserved to private parties from the domain ceded by Virginia*." [8]

■ The appellant concedes that the Spanish or Mexican grant of Porcion 72 is a valid grant. The area covered by the valid Spanish Grant has never belonged to the State of Texas. Harris v. O'Connor, 185 S.W.2d 993, Tex.Civ.App. (1944) ref., w. o. m.

Surveyor Simpson's report states that his beginning point of his survey was in the center of the present day plaza of Reynosa Viejo. Appellees contend that this central plaza was not necessarily located at the center of town from which was measured the boundaries of the jurisdiction of the Town, and the Town Commons surrounding the Town. Appellant argues that the applicable law under which the survey was made was Law IX, Title VIII, Book IV of the Recopilacion de Leyes de Los Reinos de Las Indias which provides in relevant part as follows:

> "La plaza major donde se ha de comenzar la poblacion siendo de costa de mar, se debe hacer al desembarcadero del puerto, y si fuere lugar mediterraneo en medio de la poblacion. * * *"

The translation of this provision, by the official Spanish Translator of the General Land Office, is as follows:

> "The main plaza where the town is to begin, if on the sea coast, must be at the port dock, and if inland, in the middle of of the town. * * *"

This law cited by appellant does not appear to be applicable to Reynosa Viejo for the reason that the full context of Law IX, Title V, Book IV, of the Recopilacion de Leyes de Los Reinos de Las Indias, and Law V immediately preceding the same in full context provide as follows:

> "Law VIII. That the principal Temple be erected on the site and with the disposition ordered, and the other Churches and Monasteries be erected in like manner.

> "'In Mediterranean territories, the Temple should not be erected on the Park but on a site quite a distance therefrom,

---

8. Emphasis and/or words within the parenthesis supplied.

where it shall be separated from any other building which does not belong to its community or holy orders, and because it can be seen from all places and venerated in a better manner; it should be somewhat raised from the ground, so that it can be entered from a stairway or the Royal Houses, Council or Administration House, Customs House, and the Arsenal should be built in such a manner and at such distance so as to make the Temple prominent and not obstruct it so that in case of necessity they may use the same for refuge, and if the colony should be established on the coast, place it in such a manner that upon going out to see it can be seen with its erections as port defenses, designating lots near thereto and not in its continuation where Royal Houses are to be erected, and for stores on the Plaza for the common use, imposing a somewhat moderate tax on the merchandise; and in like manner, sites should be selected on other minor plazas for Parrochial Churches and Monasteries wherever it is deemed convenient.

"Law IX. That the site, size and establishment of the plaza be as hereby ordered.

"The main plaza where the settlement should be commenced, if it be on coast of the sea, shall be established at the disembarkation of the port, and if it should be a mediterranean site, then in the middle of said colony; its form shall be that of a prolonged square which should have in length at least one and one-half times of its width, because it will then be more appropriate for the horse fairs and other such fairs; its size should be proportionate to the number of its residents, and taking into consideration the fact that settlements are likely to grow; that it not be less than two hundred feet in width and three hundred feet in length, nor more than eight hundred feet in length and five hundred and thirty-two feet in width; in this manner it will be of medium and good proportion; if it should contain six hundred feet in length and four hundred

feet in width; that four main streets run from the plaza, one through the middle of each boundary; and two others from each corner; that the four corners face the four principal winds, because if the streets should run from the plaza in this manner, they will not be exposed to the four winds which will prove very inconvenient; all of this to be in contour, and the four principal streets which are to run from the plaza shall have gates for the convenience of the users who may wish to visit the premises; and the eight streets which will run from the four corners must be free without meeting at the gates, in such form as to make the right sidewalk in relation to the plaza and street."

It is undisputed that no original monuments on the ground of the original surveys surrounding Porcion 72 can be found today. The ground conditions in this entire area of land have completely changed since the time of the original grants and from the time that the patents were first issued to the adjoining surveys of Porcion 72. All of the land has been fully developed and/or is in cultivation. It is farm land and irrigated farm land. It has been levelled, canals dug, roads, highways and cities have been built. Much of the land has been cleared. The situation as described by surveyor Simpson's testimony was to the effect that it "was very difficult to relocate the various surveys and to determine what has happened since they were patented." Porcion 72 has never been patented but the three grants which surround it have been patented based on surveys filed with the Land Commissioner of Texas. However, none of the natural or artificial monuments can be located from these adjoining surveys on the east, west and north. Only the Rio Grande on the south is present and its location today is uncertain as compared with what its location was in 1767. In order for appellant to reconstruct Porcion 72 by following the footsteps of the original surveyors, he must be able to reconstruct the starting place and follow the course and distances from that starting place to Porcion 72. It is

appellant's contention that Porcion 72 can be reconstructed, and that Surveyor Simpson has done so by beginning in the center of the plaza of Reynosa Viejo and by adding up the course and distances of the various porciones until he arrived at Porcion 72. He has attempted to locate the east line of Porcion 72 as being: "35,500 varas S. 81° 25' 37" east from the center of the plaza at Reynosa Viejo." The surveyor admits that he did not actually go to the town of Reynosa Viejo but relied on two associates who measured the distance from a monument in the center of the Military Plaza to a flagpole and by the use of surveying instruments from the top of a water tower on the Texas side of the river, he did by triangulation obtain a starting point and therefore the location of Porcion 72 as contended by the appellant. The surveyor admitted that today's plaza in Reynosa Viejo is a modern plaza and it is possible that the original had been washed away years before.

█ The state appointed surveyor upon whom appellant relies so heavily testified on cross examination before the land commissioner concerning the starting place of his survey as follows: [9]

Q: "What did you find on the ground at the military plaza of Reynosa?"

Simpson: "I did not visit the Plaza."

Q: "Is it true that Reynosa Viejo was so repeatedly inundated that they removed the whole town and no vestige of the original town can be found?"

Simpson: "Oh yes, the plaza can be found."

Q: "Yes sir, but that is a modern plaza, all traces of the original have been washed away years since, isn't that true?"

Simpson: "Very possible could be, I don't know."

Q: "If we assert that is true and you have no evidence that it is not, then for the sake of argument let's accept *is* as true. Then that location of Porcion 72 on Exhibit B becomes without significance if you did not find the right military plaza, isn't that right?"

Simpson: "I'll say yes, *the only purpose of it to begin with is to show you the general position.*" [10]

Q: "That wouldn't even be generally right unless you get the right military plaza with it."

Simpson: "No sir, not if the plaza had been moved 300 varas."

Q: "And you did not go to any plaza?"

Simpson: "No sir, Mr. Savage and Mr. Brown went over it and then we cut it in. They took pictures of it."

Q: "Then what they found was a flag pole and some concrete that are rather modern."

Simpson: "Yes, that plus the monument in the center of the plaza."

The "general position" of the plaza to locate Porcion 72 would not legally qualify in "following the footsteps of the original surveyors."

According to evidence in the record, the northern edge of Reynosa Viejo appears to have been at various distances from the river ranging from two thousand to five thousand feet south of the river in 1912, 1926–27, 1942 and 1956. The present town of Reynosa Viejo is not in the center of the Ejidos. In fact the east side of the town is shown to be west of the center of the Ejidos. See Plat 2.[11]

9. All reference to testimony throughout this opinion was that developed at the hearing before the Texas Land Commissioner, Jerry Sadler, which was transcribed and introduced into evidence as exhibit in this case.

10. Emphasis and/or words within the parenthesis supplied.

11. No particular effort has been made on our part to adhere strictly to scale on the three plats, but they give a fairly accurate picture of the layout of the land.

Appellant contends that one can find the true west line of Porcion 72 by adding the called width of Porciones 48 through 71 plus five thousand varas (one half of the called width of the Ejidos) and measuring the resultant distance magnetic east from a place in present day Reynosa Viejo. The Royal Commissioner's description of the square town commons, did not come out as described. It was 11,350 varas wide on the south side and 10,000 varas wide on the north. Appellees contend that if the appellant can find the exact shape and size of the town commons, and where the north bank of the Rio Grande intersected the east side of the Ejidos in early September of 1767, he will have the called starting point for the survey of the southend of Porcion 48. Appellees argue that even if you assume that the early day surveyors had a compass and could by its use have walked straight magnetic east in virgin brush, there would be no way today to follow the footsteps of those original surveyors, as the true deviation of magnetic north from true north was not the same in 1767 as it is today. Surveyor Simpson used a deviation of 8° 24′ 23″ east. The record indicated that the surveyors had lengths of rope and no other instruments. They were ordered to lay out porciones of three different widths plus a double size for the Captain. Instead they laid out porciones of seven different widths plus the double for the Captain. They skipped the river and impenetrable patches of brush and so indicated in their field notes. Appellees contend that even if you assume that the center of the original Town of Reynosa turned out to be the same spot as the subsequently surveyed plaza, there is still no evidence as to how long a vara was in 1767.

The standard work "ordenanzas de Tierras y Aguas" published by Mariano Galvan in Mexico City in 1834 and subsequent editions contains (among many subjects) a set of forms for use in applying for and making of original grants. The form for the order to survey reads in relevant part:

"Measurement of the cordel

"In such place on such date * * * I caused to appear before me —————— and ————— the appointed surveyors whom I ordered to wax a cordel of string or rope of hemp and measure 50 varas with a vara measuring *four Castillian palms* [12, 13] whereupon the aforementioned in my presence measured a twisted, waxed and well stretched cordel with a Mexican vara sealed in good form 50 varas long which measurement was truly and legally made in the sight and with the knowledge and by the consent of all the interested parties and their neighbors."

The indicated footnote to the text reads:

"[12] This method of measuring the cordel with that by which the measurement is verified is entirely consistent with the practice and even the legal directives, and *it is one of the causes to which should be attributed the grave errors in almost all of our agrarian surveys.*[13] The inexactitude of the vara which is taken as the standard and the difficulty of measuring the cord over it exactly makes the result inexact, and as the cord or the rope contracts or dilates with the use to which it is put and with the weather, it generally results that the measurement is bad * * *." (1883 edition, pp. 223–224)

The beginning point of the field notes of the tract which appellant contends to be vacant and unsurveyed public free school land and to constitute a vacancy is as follows:

"Beginning at a point on the present north bank of the Rio Grande River for the southeast corner of Porcion 72, orig-

---

12. No particular effort has been made on our part to adhere strictly to scale on the three plats, but they give a fairly accurate picture of the layout of the land.

13. Emphasis and/or words within the parenthesis supplied.

inally granted to Jose Maria Balli, as located call distance or 35,500 varas South 81° 25′ 37″ East from the center of the plaza at Reynosa Viejo."

Appellees contend that the assumption that Porcion 72 can be so located is patently erroneous because the survey of Porciones 38 to 80 did not begin at the assumed center of the plaza but at an unlocated point called San Miguel de las Cuevas. This was at a point on the western limit of the jurisdiction of Reynosa where it joined the eastern limit of the Jurisdiction of Camargo, and where the survey of the porcion on the north side of the river began. The Act of "Visita" provided that:

"In the same Town on the Thirteenth day of the said month, and year, the Surveyors Don Jph. Santiago Longoria and Don Jph. Maria Balli came into our presence and said: That in virtue of the Act referred to on the Twenty Sixth, and in compliance with special instructions, they have commenced running the Surveys in the North direction, and along the margins of the Rio Grande, beginning at the place where they arrived, called San Miguel de las Cuevas, they stretched the cord from West to East * * *."

They skipped over the land lying immediately north of the Ejidos

"having crossed over the two leagues of the town commons which are found between the porciones numbered 47 and 48. * * *"

they continued eastward until they located the last porcion to the east being Porcion No. 72.

On cross examination, surveyor Simpson stated:[14]

HALL: That document disclosed that Porciones 38 to 72 inclusive were laid out on the North side of the Rio Grande, is that right?

SIMPSON: 48 throu 72.

HALL: Well, Porciones 73 to 80 lie North of Los Ejidos, do they not?

SIMPSON: Porcion 48 joins Los Ejidos so it is 48 thru 72.

HALL: On the East, but the original survey was a survey of Porciones 38 to 47, then they jumped to 48 surveyed 72 and then came back and surveyed 73 to 80 North of Los Ejidos.

SIMPSON: That is correct.

HALL: The Act of the General Visit shows that when they started to survey Porcion 38 they went to a place called San Miguel de las Cuevas and started to stretch their cord from West to East at that place, does it not? Did you undertake to locate where San Miguel de las Cuevas was?

SIMPSON: No.

HALL: Now this entire block of surveys of these porciones on the North side of the river was one block or system of surveys, was it?

SIMPSON: Yes sir.

HALL: *To obtain a true location or position of any of them it would be necessary to locate the starting point on the West line of Porcion 38, wouldn't it, according to the original survey?* [15]

SIMPSON: Are you speaking of the patented position?

HALL: I am speaking of the original grant as set forth in the Act of the General Visit.

---

14. All reference to testimony throughout this opinion was that developed at the hearing before the Texas Land Commissioner, Jerry Sadler, which was transcribed and introduced into evidence as exhibit in this case.

15. Emphasis and/or words within the parenthesis supplied.

SIMPSON: *Yes, it would be.* * * *[16]

HALL: And absent that it would be relatively impossible to determine how far to the East the system of surveys actually extended at the time that the general grant was made by the crown of Spain.

SIMPSON: Yes sir, 1767."

It appears from the Act itself that although thirty-six square leagues were to be granted (six leagues in each direction from the town) only three leagues and 2850 varas were available on the west, due to the location of the east line of the land contained in the grant to the town of Camargo and its inhabitants so that the area would, of necessity, have to be made up by additional lands toward the east in excess of six leagues, which was done. The inaccuracy of the work of the surveyors and their apologies and explanation for the same appears wherein they say:

"* * * which eighty Porciones they have surveyed and marked out as they have already stated and in accordance with their instructions received and the Acts they have heard, *except in one or another where the bad condition of the land may have caused an excess;*[2] and on the other side of the river, on the boundary of Camargo, they marked out the terminus at the place called Las Cuevas."

The public square was surveyed after the survey of the above mentioned Porciones 1 to 80, inclusive, but there is no evidence that the same was in the center of the town as contended by appellant.

Possession of the various porciones was not given to the grantees at the time of the original survey, and it appears that the Captain and Chief Justice of Reynosa was summarily ordered to place the grantees in possession (*juridical possession*), i. e. done in conformity to the laws of the country, and the practice which is there observed.

"And such proceedings began on April 25, 1768 at which time, due to floods in the river which occurred in October of 1767, there were so many lagoons below the town that the original demarcations could not be found and it was necessary to again measure and locate the Porciones."

The porciones on the north side of the river appear to have been relocated and the grantees given possession, beginning at the place called San Miguel de las Cuevas. It appears that Joseph Maria Balli was placed in possession of his Porcion 72 but neither the description nor location of the Porcion is set forth. Additional variance appears insofar as the survey of the porciones adjoining the town commons on the north side are concerned, it being stated that:

"* * * such Porciones had not been marked out, and it was necessary to go about one league north in order to find sufficient open ground where the cord could be stretched and measurements made."

Again, the difficulties attendant upon the surveys or measurements and the impossibility of definitely locating either the extent of the whole area granted by the Act of the Visit or location of any individual Porcion appear where it was recited that:

"* * * the eastern boundary of the town commons on the north side of the river did not appear to have been established by the surveyors opposite the one on the south bank of the river for which reason the Porciones adjoining the commons on the north side did not hold out and the density of the woods made accurate measurements impossible."

Appellant's approach assumes that the Ejidos is square but it is not because the south side is longer than the north side and

---

16. Emphasis and/or words within the parenthesis supplied.

the north-south measurement ignores the river's width and the east line on the north side of the river is said by the "Visita" not to be opposite the east line of the south side of the river. Appellant further approaches the bases of his survey as assuming that the present day monument near the flagpole is the *centro* [17] of the original unsurveyed village from which the 1767 surveyors started their surveys. Appellant assumes that this is in the dead center of the Ejidos. Appellant's surveyor admits that he made no attempt to locate San Miguel de las Cuevas, the actual starting point for the laying out of the porciones.

Appellant's contention that Porcion 72 can be located by reference to the center of the plaza in the present town of Reynosa Viejo is contrary to the clearly established facts as set forth above from the Act of the "Visita" upon which he must rely. It has been held that the greater the distance the more probability of error. Matador Land & Cattle Co. v. Cassidy-Southwestern Commission Co., Tex.Civ. App., 207 S.W. 430, 432. We hold that there is no legally competent evidence in the record before us that appellant has established the beginning point of the original survey or that he was able to re-establish and follow the footsteps of the original surveyors.

The only natural objects referred to in the Act have long since disappeared and are unknown, including the beginning point of the porciones north of the river at San Miguel de las Cuevas. Excesses existed in unidentified porciones which were actually granted and the grantees were placed in actual possession of their lands. This demonstrates that the porciones were not laid out with the meticulous nicety of present day surveyors. The record is clear, from the positive statements of the surveyors and of the Captain that, juridical possession was given to each grantee as above pointed out. State v. Sasis, 47 Tex. 314; State v. Rus-

sell, 38 Tex.Civ.App. 13, 85 S.W. 288 (1905) writ ref.; State v. Corrigan, 42 Tex.Civ. App. 171, 94 S.W. 95, 100 (1906) writ ref. @ 94 S.W. 101; United States v. Pico, 5 Wall. 536, 72 U.S. 540, 18 L.Ed. 695; Carmichall v. Stanolind Oil and Gas Co., Tex. Civ.App., 256 S.W.2d 129, writ ref.

Jose Maria Balli was placed in juridical possession of Porcion 72. The State of Texas relinquished all her right and interest in Porcion 72 to Jose Maria Balli, his heirs and legal assigns by the Act of 1852, supra. Since Porcion 72 has not been patented, consideration must be given to the evidence of the location of this porcion. Therefore, it is necessary for us to review all of the evidence concerning the grants and boundaries surrounding Porcion 72, i. e., the Rio Grande River on the south; Porcion 71 on the west; Los Torritos on the east and the R. J. Swearingen Tract on the north.

### RIO GRANDE RIVER

The courts of Texas judicially know the unstable character of the lower Rio Grande River. The 1905 Convention between the United States and Mexico for the elimination of bancos in the Rio Grande, 35 Stat. 1863, states its purpose in its preamble:

"Whereas, for the purpose of obviating the difficulties arising from the application of Article V of the Treaty of Guadalupe-Hidalgo, dated February 2, 1848, and Article I of the Treaty of December 30, 1853, both concluded between the United States of America and Mexico— difficulties growing out of the frequent changes to which the beds of the Rio Grande and Colorado River are subject—"

The case of Denny v. Cotton, 3 Tex.Civ. App. 634, 22 S.W. 122, 1893, writ refused, describes the instability of the course of the

17. Emphasis and/or words within the parenthesis supplied.

Rio Grande likening it to the Missouri River in this respect.

All of the portions were said to be 25,000 varas long from the Rio Grande. Hence, the original north end of Porcion 72 was at least 25,000 varas north of wherever the north bank of the Rio Grande crossed the south end of the porcion in September of 1767. It is undisputed that the Rio Grande has meandered over a substantial portion of the Rio Grande Valley. Exhibits from the International Boundary Commission United States and Mexico clearly show that the river has been at various places in both what is now United States and Mexico at considerable distances from the present bed of the river. As can be seen from these exhibits a single banco may result in a shift of the river's position of at least three thousand feet or more in one avulsive change.[18]

On the maps furnished by appellant's surveyors one such banco called "Jalisco Banco No. 67" (see footnote # 3) [19] exists northward from the Rio Grande in Porcion 72. The west line of Porcion 72 as it presently exists according to appellant's surveyor calls for this line to be 26,660.74 varas long and its east line from the river to its north-

east corner as being 27,921.78 varas long. There are many resacas [20] all over the lower reaches of the Rio Grande River which were at one time or another the bed of the Rio Grande River. One such resaca (dry) is recited as being 4327 varas north of the Rio Grande River in 1877 in the field notes of the Los Torritos Grant. All of the porciones from and including Porcion 71 westward through Porcion 63 have today a common northern boundary line. See Plat 2.[19] Porcion 72's northern boundary is shown on the official General Land Office map to be an easterly extension of these common northerly boundary lines. Appellant's surveyor admits that he has no knowledge of the whereabouts of the Rio Grande on the south end of Porcion 72 in 1767 which would be the only relevant year in retracing the steps of the surveyor.

■ Appellant's contention that a vacancy exists on the north end of Porcion 72 is based entirely upon the original called distance of 25,000 varas north from the Rio Grande River, and further based upon the assumption that Surveyor Simpson and other surveyors had called for a point in

18. A "banco" is a tract of land cut off from one side of the Rio Grande to the other by an *avulsive* [2] change in the river's course. Jalisco Banco No. 67 is typical. These are surveyed and monumented by the International Boundary and Water Commission (formerly the International Boundary Commission) —United States and Mexico and then "eliminated," i. e., sovereignty passes so that the two countries eliminate the problem of having these little tracts on the wrong sides of the stream, all pursuant to the Convention for the Elimination of Bancos, 1905, 35 Stat. 1863. See San Lorenzo Title & Improvement Co. v. City Mortgage Co., Tex.Civ.App., 48 S.W.2d 310.

19. No particular effort has been made on our part to adhere strictly to scale on the three plats, but they give a fairly accurate picture of the layout of the land.

20. The term "Resaca" as used in the region of the Rio Grande Valley of

Texas was defined by Hon. Harbert Davenport of Brownsville, Texas, now deceased, as being "synonymous with a former distributory (a river branch flowing away from the main stream) of the main river, which at times of high or rising waters, receives and discharges a portion of the excess flow." Some resacas in the lower Rio Grande Valley are known to be former beds of the Rio Grande River itself before the river changed its course or was disconnected. In a brief filed in the Supreme Court of Texas on an application for writ of error in the case of City of Weslaco v. Turner, 237 S.W.2d 635, TexCiv.App., ref. n. r. e. Judge Davenport said further that: "The men of General Taylor's occupation forces, 1846–1848, learned this term and liked it; and, on their return home, took it with them into every portion of the United States": We adopt this definition and explanation.

the bank of the old river. Even surveyor Simpson testified that:

"I will concede that the north line as located on Exhibits A and C is pretty hard to tie it in. I would say it is pretty vague."

There is no evidence of the location of the Rio Grande River in the year 1767 from which point the northerly extension is dependent, if you follow the original survey. As will be shown hereafter, secondary evidence places the northerly boundary of Porcion 72 adjoining the south boundary of the Swearingen Survey and an easterly extension of the north boundary lines of the other porciones i. e. 63-71. We hold there is no competent evidence in the record that would establish a vacancy on the north of Porcion 72.

## PORCION NO. 71

Porcion 71 was relinquished by the State of Texas February 10, 1852, Ch. LXXI, Sec. 1 * * * County of Cameron * * (22) Narciso Cavazos, Porcion Seventy one, Reynosa; * * * a patent was issued by the State of Texas to Narciso Cavazos on the 17th day of January, 1882. A portion of the description from this patent refers to both Porcion 72 and the Los Torritos Grant immediately to the east. It reads as follows:

"Beginning at a large post in the N. bank of the Rio Grande, which post is the SE cor. of this tract, and the SW cor. of *Porcion No. 72, Jose Maria Balli,* 'and which brs. from the SW cor. of *the sur. of Los Torritos* in the name of Maxcimo Dominguez *N 55° 35' W 1750 vs.*' Thence N°8 45' E with the *W line of said Porcion No. 72,*' and the E of this (survey) * * a post on the SW side of the Military Telegraph Road said post being *Mkd. P. 71 P. 72. * * *"* (2) "a large post for

the NE cor. and *which is also the NW cor. of Porcion No. 72. * * *"* The west side of Porcion 71 called for an adjoiner with Porcion 70.[21]

Although Porcion 71 has been patented on field notes which call for its adjoinder along the east side with the west line of Porcion 72 appellant's surveyor Simpson would place the west line of Porcion 72, 271 varas west of the patented east line of 71. It is clear from the field notes of the patent itself issued by the Governor of the State of Texas for Porcion 71, that consideration was given for its beginning point by reference to the Los Torritos to the east and its adjoinder to Porcion 72.

## THE LOS TORRITOS GRANT

The Los Torritos is a Tamaulipas Grant made in 1834. This particular grant was a part of a system of four Mexican Grants lying east of the jurisdiction of Reynosa. These four grants were laid out beginning with the most easterly grant called La Blanca followed by Agostadero del Gato, then by the Santa Ana Grant and finally by Los Torritos. They were all greater in area and generally much wider than the individual porciones belonging to the jurisdiction of Reynosa. See Plat 2.[22] Appellees contend that the west line of the Los Torritos Grant joins the east line of Porcion 72. Surveyor Simpson made no effort to locate the starting place of these four grants nor any effort to locate any of the boundary lines of the three grants to the east of Los Torritos. He admitted that he found nothing to monument the east line of Los Torritos.

It appeared from the exhibits as well as from the report made by appellant's surveyor to the Commissioner that the Los Torritos Grant was locally referred to as "El Toro" in the original grant. The description of the first call going from east

---

21. Emphasis and/or words within the parenthesis supplied.

22. No particular effort has been made on our part to adhere strictly to scale on the three plats, but they give a fairly accurate picture of the layout of the land.

to west was from "Point A boundary Arma-gosazal to Point B boundary of Los Burros". It appeared that the adjacent neighbors Don Benigno Leal, the grantee of the Santa Ana Grant on the east of Los Torritos, and Don Francisco Balli on the west were present and of assistance at the time Los Torritos was granted and when the boundary of Los Burros on the west was called for. Many of these boundary points and places had local names and it was suggested that an old lake in Porcion 72 called Los Burros was the accepted name for Porcion 72, the same as El Toro was the accepted name for Los Torritos. When grants were laid out it was common for the neighbors on either side to be present to give witness to the monuments or the asserted location of the boundary. Appellees contend that Don Francisco Balli was an heir of Jose Maria Balli when Los Torritos was laid out in 1834, some fifty four years after Porcion 72. Be that as it may, the Los Torritos Grant was confirmed by decree of the District Court of Hidalgo County on the 25th day of May, 1860 in a lawsuit styled Benjamin F. Kidder v. State of Texas and title was relinquished pursuant to the Act of February 11, 1860, passed by the Legislature authorizing the bringing of this suit and adjudicating certain legal claims for land against the State of Texas. The Los Torritos Grant was then surveyed by J. S. Eivet, Deputy District Surveyor for Hidalgo County, which survey was certified by Andres Salinas, District Surveyor, and upon which a patent was issued by the Governor of the State of Texas on June 4, 1877. Accompanying the field notes was a map or "Plan of the Agostaderos of Los Torritos surveyed in August and September A.D. 1876 in Hidalgo County, Texas. J. C. Eivet Dep. Dist. Surveyor" and filed with the General Land Office. This map showed (pictorially) Los Torritos and Porcion 72 adjoining each other.

The patent described the Los Torritos Grant as beginning on the west line of the adjoining Mexican Grant called Santa Ana, for the east line of Los Torritos. The description then went north from the Rio Grande River to the northeast corner of the grant, then west to the N.W. corner, and then south along the west line of this grant

"through Cenigo Prairie at 1800 vs. struck dense growth mesquite and chaparral at 3226 vs. *passed NE corner of the tract of land known as Porcion No. 72 and originally granted to Jose Maria Balli; thence on the same course on the west line of this tract and east line of Porcion 72* though a heavy growth of chaparral * * * at 26755 vs. post *on Brownsville Road where line crosses Mkd Fulton ϸ 72 E.L.* * * *" [23]

It is clear from the field notes and the patent that Los Torritos joined Porcion 72.

## THE R. J. SWEARINGEN TRACT

The R. J. Swearingen Tract which connects with Porcion 72 on the north is the most junior survey concerning the land surrounding Porcion 72. It was patented on November 26, 1924, and called for the place of beginning a transit hob at the northeast corner of Porcion 72 and the west line of Los Torritos granted to M. Dominguez.

## PORCION NO. 72

The first record in the General Land Office of Porcion 72 was a survey filed by J. C. Eivet. He purportedly surveyed this particular survey in August and September of 1876. The field notes were filed on June 26, 1878. These notes were cancelled by corrected field notes. Later surveyor Andres Salinas made another survey of Porcion 72 and filed them in 1881. On December 22, 1882, another set of field notes was filed. All of these were endorsed "Cancelled by corrected field notes". The fourth set was finally filed by Mr. Andres Salinas on March 3, 1884. These have never been cancelled. Appellant contends that these

---

23. Emphasis and/or words within the parenthesis supplied.

conglomeration of disagreements on these surveys raises a factual issue as to the correct location of Porcion 72. He contends that the first field notes disconnected with Porcion 71, the second conflicted with Los Torritos. He points to the remarks of the surveyors to the effect that Porcion 72 in the original survey did not run far enough north to give the depth of Porcion 72 equal to that of the surveys of the other adjoining porciones and that the north line was not long enough by 328 varas. However the last field notes of Porcion 72 filed in the General Land Office in 1884 which have not been cancelled, have these calls in the description and read as follows:

"Beginning at a post on the N. margin of the Rio Grande River * * * SW corner of this survey. no bearing trees. Thence N 8° 45' east at 129 vs. past bank of old river bed, at 2447 vs *to post. marked Por. 71 on west side of Porcion 72,* * * * to post set for N.E. corner of Porcion No. 71, and N.W. corner of the survey. Thence with North line S 81° 15' E at 1578 vs. set post mkd Por. 72. Thence S 8° 45' W. with *the True west line of grant to Maximo Domingues called 'El Toro'. or 'Los Toritos'* * * * passed Military Telegraph Road 21 vs. west of post mkd Fulton—Por. 72 E. L. * * * (to) margin of Rio Grande for SE corner of this survey. Thence up the Rio Grande with its margin * * * to place of beginning." [24]

"surveyed on the 1st day of December, 1882." This was followed by the remarks of the surveyor.

"This being the third time the lines of this porcion have been run out, the first disconnecting it with Porcion 71 and the second conflicting with Los Torritos."

> /s/ Andres Salinas
> County Surveyor of
> Hidalgo County, Texas."

This was followed by an additional explanation by William P. Dougherty, surveyor for Hidalgo County to the effect that the enclosed field notes are a corrected survey of the tract of land granted to Jose Maria Balli and are correct. He then made explanation that the original survey did not go far enough to the north and the north line was short 328 varas.

Porciones 71 and 72 were granted by the Crown of Spain in 1767 by what is known as the Act of the General Visit of Reynosa. Title to both of these porciones was confirmed by the Act of February 10, 1852. Porcion 71 was patented by the State of Texas under date of January 16, 1882 and the patent· description calls for adjoinder with the west line of Porcion 72.

The Los Torritos Grant is a Tamaulipas grant, made in 1834, and the grant and original field notes are both of record in the case. The description of the original grant of Los Torritos calls for adjoinder with the east line of Porcion 72. Patent was issued on the Los Torritos Grant under date of June 4, 1877, and calls for adjoinder with the east line of Porcion 72. The R. J. Swearingen Survey was patented on November 26, 1924 and the patent description calls for adjoinder on its south line with the north line of Porcion 72.

Appellant's surveyor stated that he could not find any original monuments that would establish the location of either the Los Torritos Grant or Porcion 72 and that in order to locate Porcion 72 as actually granted by the Act of the General Visit in 1767 it would be necessary to locate the starting point on the west line of Porcion 38. This he did not do. Without this location, it would be relatively impossible to determine how far to the east the system of surveys actually extended at the time the general grant was made by the Crown of Spain in 1767.

24. Emphasis and/or words within the parenthesis supplied.

Surveyor Simpson testified that he could not find any natural or artificial monuments on the patented locations of the Los Torritos Grant or Porcion 71. Los Torritos was a part of a system of four Mexican grants laid out from east to west. This surveyor made no effort to locate the three grants immediately east of Los Torritos and found nothing to monument the east line of Los Torritos. Surveyor Simpson testified that the translated version of the Spanish descriptions in the Los Torritos Grant of 1834 calls for "Los Burros" on the west. He testified to the effect that Porcion 72 could have been known as "Los Burros Grant" and that Los Torritos was bounded by Los Burros on the west. He admitted that the original Canales survey of Los Torritos called for Los Burros as being the west corner of Los Torritos and in a number of documents found there were references to Los Burros as being the place of Porcion 72. At another place the surveyor testified that there was a recital in the original Los Torritos grant to the effect that the declination agreed with that laid out by the ancients on the *"adjoining lands",* there being no adjoining land on the north or south and there being only the Santa Ana survey to the east. He then admitted that it was reasonable to construe that it was referring to the adjoining land to the west. *(Porcion 72).* He further admitted that it was probable that Porcion 72 was locally referred to as "Los Burros". After testifying that he reviewed quite a few old deeds and transfers prior to, and subsequent to 1875, he (the surveyor) was asked *if he ever found an instance where the owners of those properties indicated in any way that there was not an adjoinder between Porcion 72 and Los Torritos.*[25] Surveyor Simpson said "I don't recall one, no sir." In the last uncancelled survey notes of Survey 72 the surveyor of Hidalgo County, Mr. Wm. P. Dougherty, certified that "the original

grant of Maxcimo Dominguez called 'El Toro' calls for Porcion 72 as its west boundary."

■ The rules for the construction of grants is to determine the intention of the grantor; once that is established, all else must yield. Giles v. Kretzmeier, 239 S.W.2d 706 (Waco Civ.App.1951); Phillips Petroleum Co. v. State, 63 S.W.2d 737 (Austin Civ.App.1933 wr. ref.); Leone Plantation v. Roach, supra; Southern Pine Lumber Co. v. Whiteman, infra; State v. Coleman-Fulton Pasture Co., 230 S.W. 850 (Tex.Civ.App.1921); State v. Flick, 180 S.W.2d 371 (El Paso Civ.App.1943, ref., w. o. m.).

"He who at this late day when lands have become valuable, and those who originally surveyed them have passed away, makes a location between grants which surveyors who originally surveyed them, more than thirty years ago, *under their official oaths, declared to be continguous, should come prepared with evidence which will clearly show that such declarations were made in mistake,* and such testimony must consist of something more than that one or both of the grants will be slightly in excess of the area called for, to make such declarations good." Freeman v. Mahoney, 57 Tex. 621.[25]

From the time of the Act of the General Visit of Reynosa in 1767 until the filing of this suit, a period of approximately two hundred years, no question whatsoever existed as to the true location of Porcion 72. Stewart's Road, the present accepted east line of Porcion 72, is 1250 varas east of the east line of Porcion 71. This agrees with the original called width of Porcion 72. It adjoins Porcion 71 on the west and the Rio Grande River on the south. See Plat 3.[26]

---

25. Emphasis and/or words within the parenthesis supplied.

26. No particular effort has been made on our part to adhere strictly to scale on the three plats, but they give a fairly accurate picture of the layout of the land.

When the Los Torritos Grant was made it was the established public policy of Mexico and the various Mexican states, to avoid vacancies between grants of land. The colonization law of Coahuila and Texas made such a specific provision by virtue of the colonization law contained in Decree No. 16 of the Congress, Article 20 providing:

" * * * that no vacancies be left between the tracts which shall be carefully avoided in the distribution of lands; it shall be laid off in squares or other forms, although irregular, should the locality so require; and to prevent litigation and dispute in making the distribution aforesaid, as well as in the designation of sites, whereon new towns are to be founded, the adjoining proprietors, should there be any, should be previously notified." (1 Gammel, Laws of Texas, p. 128.)

Although the colonization law of Tamaulipas was not as explicit as was the law of Coahuila and Texas, the same public policy is, we think, expressed in Article 22 of such colonization law wherein it is specifically provided:

"All adjudication and possession of lands designated for settling shall be made with previous citation of the adjoining proprietors. As little detriment as practicable shall be occasioned to those who do not appear, of themselves or by attorney, and their complaints shall not be heard." (1 Gammel, Laws of Texas, p. 457.)

■ When in the absence of natural marks on the ground to show a survey and there is a total absence of evidence to supply such marks, recourse can be had to secondary evidence. 11 C.J.S. Boundaries § 23, p. 569, Public Lands.

■ The law is well stated in this state that when the line of a junior survey is called to be identical with that of a senior survey the location of the senior line is conclusive of the location of the junior line, Southern Pine Lumber Co. v. Whiteman, 163 S.W.2d 212 (Tex.Civ.App.1942, writ

ref., w. o. m.) ; Kirby Lumber Co. v. Gibbs Bros. & Co., 14 S.W.2d 1013 (Comm.App. 1929) ; Leone Plantation v. Roach, 187 S. W.2d 674 (Tex.Civ.App.1945, writ ref. w. o. m.) ; and that extraneous evidence is incompetent to pull them apart. Magnolia Petroleum Co. v. Jones, 138 Tex. 67, 158 S. W.2d 548 (1941).

■ Indeed there is authority for the contention that when two tracts are called to have common boundaries, then the State cannot pull them apart to create vacancies between them under any circumstances. In State v. Ohio Oil Co., 173 S.W.2d 470, Tex. Civ.App.1943, ref. w. o. m.

" * * * where the field notes show that separate tracts or sections of land are tied together and have common corners and lines, it is not necessary to resort to rules of construction of the field notes, because they speak for themselves and exclude the supposed vacancy; * * * Since the State cannot pull these common corners and lines apart so as to establish a vacancy between them, and since it has parted with the title to the land by patent on either side of the common line, it is not concerned with its actual location on the ground * * * "

Wyatt v. Foster, 79 Tex. 413, 15 S.W. 679. Such long recognized and established boundaries will only be disturbed on the most cogent and compelling evidence. Blaffer v. State, Tex.Civ.App., 31 S.W.2d 172, writ ref.

"The public policy of this state, as announced in repeated decisions, demands the security of land titles emanating from the state, and, where ancient boundary lines have been recognized for long periods of years, they will not be lightly disturbed, to the detriment of those who have dealt upon the faith of them. The record here conclusively shows that, as stated by Mr. Smedley, the south pond corner 'is regarded as one of the most positive and definitely fixed corners in that portion of Harris County.' Property rights, extend-

ing into the millions of dollars, are based upon that location and its recognition. Public policy and every consideration of right, justice, and fair dealing demand that this location should not now be destroyed except upon the most cogent and compelling evidence. * * *"

Indeed the Beaumont Court of Appeals, though electing not to base their finding of no vacancy on this point, stated:

"We incline toward the belief that nothing short of original markings could justify departures from lines and corners so long recognized and accepted. * * *" Kirby Lumber Corporation v. Campbell, 331 S. W.2d 388.

In this connection, Simpson admitted that he could find none of the original markings or natural features described in the survey or patent description of Los Torritos.

 Giles v. Kretzmeier, 239 S.W.2d 706; Phillips Petroleum Co. v. State, 63 S. W.2d 737 writ ref.; Leone Plantation v. Roach, 187 S.W.2d 674 ref. w. o. m.; Southern Pine Lumber Co. v. Whiteman, 163 S.W.2d 212 ref. w. o. m.; State v. Coleman-Fulton Pasture Co., 230 S.W. 850 and State v. Flick, 180 S.W.2d 371 ref. w. o. m., also hold that the intention of the surveyor controls and that where it is shown the surveyor intended to join one survey with another, nothing short of the location of natural objects called for in the field notes can break the adjoinder call.

In Phillips Petroleum Co. v. State, supra, the court found that it was the intention of the surveyor to join the junior survey with the senior and thus the fact that the call distance was short could not create a vacancy. In so holding the court stated the following:

"As stated in Woods v. Robinson, 58 Tex. 655: 'The rules for the construction of grants, and for ascertaining their boundaries, which have from time to time been announced by the court and have been acted on in establishing their lines,

are all designed for the purpose of carrying out the intention of the grantor. When this intention is once made manifest, all else must yield to and be governed by it. * * *'

"And, where an established line of a senior survey is called for, or a line of a senior survey which may be definitely ascertained and located from other established corners of the same or adjacent established surveys, such call should be given the dignity of an artificial object and control calls for course and distance. * * *

"* * * While we are cognizant of the fact that these lands have become immensely valuable since the discovery of oil thereunder, and that surveys in that section of the state were often inaccurately made and frequently by such methods included excesses in acreage, then of little value, which but for the hardships and barren nature of the land would probably never have occurred, but where the intent as then manifested is clear and patent, the increased values of such lands furnish no reason for any departure from well-settled rules of decision and the construction of grants made a generation ago, and adhered to consistently by the courts."

 Appellant has attempted to locate the patent location of Los Torritos from a point called for in junior survey, i. e. Porcion 71. This cannot be done as held in the following cases: Williams v. McLeroy, Tex. Civ.App., 135 S.W. 251; Gill v. Peterson, 126 Tex. 216, 86 S.W.2d 629; Shelor v. Humble Oil & Refining Co., Tex.Civ.App., 103 S.W.2d 207, writ dism.; Land v. Dunn, Tex.Civ.App., 226 S.W. 801; Garcia v. State, 274 S.W. 319; Titterington v. Trees, 78 Tex. 567, 14 S.W. 692; Russell v. Hunnicutt, 70 Tex. 657, 8 S.W. 500; Thacker v. Wilson, Tex.Civ.App., 122 S.W. 938. The surveyor did not attempt to locate the Los Torritos Grant from the Santa Ana Grant or the other two grants which made up the system of four surveys lying east of Porcion 72.

As pointed out the patents to Porcion 71, Los Torritos and R. J. Swearingen survey each called for adjoinder with Porcion 72 and, of course, the Rio Grande River constitute the southern boundary of the Porcion 72. These patents are subject to attack only by the State or by one who holds an interest in the land that is prior or superior to that of the patentee, but cannot be questioned by appellant. Todd v. Fisher, 26 Tex. 239; Underwood v. King, 102 Tex. 561, 119 S.W. 298; Dunn v. Wing, 103 Tex. 393, 128 S.W. 108; Antone v. Kurth Lumber Mfg. Co., Tex.Civ.App., 205 S.W.2d 438, wr. ref., n. r. e.; O'Keefe v. Robison, 116 Tex. 398, 292 S.W. 854; Smith v. Temple Lumber Company, Tex.Civ.App., 323 S.W.2d 172, wr. ref., n. r. e.; State v. Indio Cattle Co., Tex.Civ.App., 154 S.W.2d 308.

As has been stated herein, Jose Maria Balli was placed in juridical possession of Porcion 72. If there should be any doubt as to which of two possible constructions should prevail—that for course and distance or that of the adjoinder with Los Torritos and other grants, it should be resolved in favor of the long asserted right under juridical possession which is shown in this case. State v. Sais, 47 Tex. 314; State v. Russell, 85 S.W. 288, Tex.Civ.App. (1905) writ ref.; State v. Corrigan, 94 S.W. 95, 100, Tex.Civ.App. (1906) writ ref., at 94 S.W. 101; United States v. Pico, 5 Wall. 536, 72 U.S. 536, 540, 18 L.Ed. 695; Carmichall v. Stanolind Oil and Gas Co., 256 S.W.2d 129, wr. ref. This grant of Porcion 72 was relinquished by the State of Texas. As was stated in State v. Balli, supra, the court said, 190 S.W.2d at pp. 96–97:

"In the case of Veve y Diaz v. Sanchez, 226 U.S. 234, 33 S.Ct. 36, 38, 57 L.Ed. 201, the court say: 'A tract may be so well known by name that it can be described and conveyed without other designation. And there are cases where, in the sale of a ranch, or of an island, or of a well-known plantation, the limits described by name have prevailed when there was a discrepancy between it and the other descriptive terms set out in the same deed. Lodge's [Lessee] v. Lee, 6 Cranch 237, 3 L.Ed. 210.' "

At page 97 of 190 S.W.2d of the opinion:

"It seems to us that the true rule applicable in this case is stated in Thompson on Real Property, § 3100, as follows: 'A description of a tract of land by name only points to evidence aliunde showing the existence of a body of land generally known by the name designated, and such evidence is admissible to apply the name to the land intended. A grant of the land by such name passes the title to the entire tract known by that name. * * * In order for a general grant to be limited by a subsequent particular description such an intention must definitely appear from the terms of the particular description.' "

Many of the exhibits in the record such as sketches, letters and surveys showing declinations and other discrepancies create no fact issue because they are not admissible in evidence. See Arts. 250, 251 V. A.C.S. Falls County v. Young, 77 S.W.2d 912 (Tex.Civ.App.1934), wr. dism.; Daniels v. Fitzhugh, 13 Tex.Civ.App. 300, 35 S.W. 38; Landry v. Robison, 110 Tex. 295, 219 S.W. 819 at 821. Original grants, patent surveys, official county maps, adopted by the General Land Office, are admissible. Art. 5421c V.A.C.S., Section 3, contains a definition of surveyed lands, and Section 6(a) defines the term vacancy. When these definitions are applied to the undisputed facts of this case the Act does not permit the appellant to establish vacant unsurveyed lands as contended. The lands in question are titled, and the grants of such lands have not been cancelled or annulled. Foster v. Gulf Oil Corp., 335 S.W.2d 845 (Tex.Civ.App.1960, ref. n. r. e.). The long continued occupancy (juridical possession) of Porcion 72 with which is conceded to be a valid grant, its adjoinder to the Los Torritos under claim of title and ownership at least since 1876 and probably since 1834, is sufficient to preclude the existence

of a vacancy as defined by Art. 5421c. A case similar to the question involved herein is Sullivan v. Solis, 114 S.W. 456, Tex.Civ. App. (1908), opinion written by Justice Fly. See also Harris v. O'Connor, 185 S.W. 2d 993; Ballard v. Stanolind Oil & Gas Co., 5 Cir., 80 F.2d 588.

Although Appellant inferentially questions the validity of the grant of Porcion 72, such position is untenable. Not only is the validity of the grant recognized and protected by the Treaty of Guadalupe Hidalgo but it is entitled to protection under the Constitution of this State. It was confirmed by the Act of 1852 and it is immaterial whether a patent has been issued by the State of Texas. Texas-Mexican Ry. Co. v. Jarvis et al., 69 Tex. 527, 7 S.W. 210; Sullivan v. Solis et al., 114 S.W. 456; Downing et al. v. Diaz et al., 80 Tex. 436, 16 S.W. 49; Sadler v. Poole, Tex.Civ.App., 366 S.W.2d 881, err. ref., n. r. e.; Barrow v. Boyles, 122 Tex. 416, 61 S.W.2d 783; Guenther v. Robison, 118 Tex. 485, 17 S.W. 2d 765; Fitzgerald v. Robison, 110 Tex. 468, 220 S.W. 768; State v. Bradford, 121 Tex. 515, 50 S.W.2d 1065; State v. Balli, 144 Tex. 195, 190 S.W.2d 71 (1944). See State v. Valmont Plantations, supra, 346 S.W.2d beginning at p. 872 et seq.—see particularly p. 873 as to the various grants and reference to relocation of the town of Reynosa. Appellant's point one is overruled.

The City of San Juan is admitted by both parties to lie largely in Porcion 72. The city of Alamo to the east of San Juan, is shown by some exhibits to lie in part in the Los Torritos Grant. Appellant specifically excepted and excluded from his application filed in the General Land Office and from the description of the alleged vacancy contained in his petition, any land described as lying within the corporate limits of any city, town or village. However, it was contended by the defendants in the trial court, that because the undisputed record shows that Porcion 72 and Los Torritos are valid grants located partly in the cities of San Juan and Alamo, the boundary lines of said grants as generally recognized, negative the existence of the alleged vacancy. Therefore, the appellees contend these generally recognized boundaries are conclusively presumed correct under Section 1 of Art. 5305a V.A.C.S. This article reads as follows:

"Sec. 1. The surveys of all lands heretofore or hereafter made, either actually on the ground or by protraction, and returned to the General Land Office and upon which patents have been issued or sale and award been made, and all valid grants by former governments, and which said surveys are located in whole or in part within the corporate limits of any city, town or village are hereby declared valid surveys and the titles to the land included within the lines of said surveys as returned to the General Land Office are hereby vested in the parties for which the same were made, their heirs, successors and assigns; provided, however, in all cases of law or equity involving boundary, title, or possession of land where the location of any such surveys or the extent or boundaries thereof shall be in issue, the corners, lines, and boundaries thereof which at the date of such incorporation were generally recognized and which have for ten years prior to filing of said suit been generally recognized and acquiesced in, shall be conclusively presumed to be the original corners, lines and boundaries of said surveys.

Sec. 2. In all cases involving boundary, title, or possession of surveys, partly or wholly included in any such incorporated city, town or village in Texas, where there is sought to be established a vacancy between surveys, the field notes and official maps in use in the General Land Office at the date of such incorporation, shall be conclusive as to the nonexistence of such vacancy, and if no vacancy appears from said field notes or maps, it shall be conclusively presumed that no such vacancy exists. Acts 1931, 42nd Leg., p. 422, ch. 254."

Appellant's three remaining points are directed to the error of the trial court in granting appellees' motion for summary judgment because: Point 2—Art. 5305a properly construed, has no application to the facts presented in this case; Point 3—Art. 5305a is unconstitutional as violative of Sec. 4 of Article 7 of the Texas Constitution if applied to the fact situation presented in this case and Point 4—that even if Art. 5305a is constitutional the record reflects the existence of a genuine issue as to the material fact of where the boundaries of the grants involved were "generally recognized" to be at the date of incorporation of the cities involved.

The city of San Juan was incorporated in 1917 and the city of Alamo in the year 1924. The official map in use by the General Land Office dated 1911, shows Porcion 72 and the Los Torritos Grant joining each other and no vacancy appears from such map. The generally accepted division line between Porcion 72 and Los Torritos for at least the last forty years has been Stewart's Road (now Farm Road 1426) and the northerly extension of such road. It is also admitted by appellant's surveyor as being the generally recognized boundary between these two grants today. However, as appellant would construe the east line of Porcion 72 (from the surveyor's survey based on the "Vista") it would lie west of Stewart's Road and Los Torritos east of this road. See Plat 3.[27] Therefore, appellant contends if the quoted provisions of this article are given exclusive effect it would move the east line of Porcion 72 eastward to Stewart's Road from where he construes it to be, and the west line of Los Torritos westward to Stewart's Road from where he construes this line to be. Therefore, by virtue of this statute the State of Texas has been divested of title to land which otherwise it would have owned. This he contends, that if the State can be divested of its title by "general recognition" and without any payment whatever to the State, it would be violative of the State Constitution, Section 4, Art. 7, which provides that:

" * * * [t]he lands herein set apart to the Public Free School Fund, shall be sold under such regulations, at such times, and on such terms as may be prescribed by law; and the Legislature shall not have power to grant any relief to purchasers thereof."

In view of the fact that the State of Texas has no title in either of these grants (Porcion 72 and Los Torritos) which adjoin each other as a matter of law as we have held herein, there is no vacancy as a matter of law. Therefore, it is not necessary for us to construe the constitutionality of this Article as divesting title to State owned land as contended by the appellant.

Although, as we have held herein, these two grants join each other and therefore there is no vacancy, as late as 1914 at least one surveyor did not agree with others as to the exact on the ground location of the boundary between these grants with complete certainty. The record does show that all the surveyors of the patented surveys agreed that these two grants adjoined each other. There was some evidence in the record that the boundary between these two old original Mexican grants was along a line extending south from the east boundary of the Swearingen Tract to the Rio Grande River. See Plat 3.[27] Other evidence placed it on Stewart's Road and the northerly extension thereof. However, where the exact boundary between these two grants would lie, would only be of importance to the owners of the land in Porcion 72 and Los Torritos. This has never been in dispute. Although the record does not show exactly when the title parted to Porcion 72 and Los Torritos, the record is clear that land was conveyed from the owners of Porcion 72 and the owners of the Los Torritos Grant, to a common owner of various parts of these grants, so that eventually one grantee would own a tract of land lying partly in Porcion

27. No particular effort has been made on our part to adhere strictly to scale on the three plats, but they give a fairly accurate picture of the layout of the land.

72 and partly in the *Los Torritos Grant.* At least four subdivisions or resubdivisions of large tracts of land were eventually laid out by a common owner who had title to land on both sides of either boundary between these two grants. So wherever the exact common boundary of the original grant of Porcion 72 and Los Torritos lay, its importance was completely lost when the one common owner of the land on both sides subdivided and/or resubdivided these lands in the early part of this century.

We believe that the evidence conclusively shows that the surveys of Porcion 72 were located in part within the corporate limits of the city of San Juan at the date of its incorporation and that the lines and boundaries of such survey were generally recognized for ten years prior to the filing of appellant's suit. By virtue of Article 5305a V.A.C.S., this fixes the east line of Porcion 72, where it now adjoins Los Torritos. This, of course, would only concern the property owners along this boundary. Because there is no vacancy as a matter of law between these two boundaries, the application of this article would not affect appellant.

Judgment of the trial court is affirmed.